# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATERA, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAREDX, INC., )<br>)<br>Defendant. )<br>) | C.A. No. 20-38 (CFC) (CJB)<br><br>(CONSOLIDATED)<br><br>**HIGHLY CONFIDENTIAL –<br>ATTORNEYS' EYES ONLY<br>FILED UNDER SEAL** |

## DEFENDANT CAREDX, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION #3 FOR SUMMARY JUDGMENT THAT THE '724 AND '544 PATENTS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION

Dated: August 11, 2023

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com

W. Sutton Ansley (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7000
sutton.ansley@weil.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendant CareDx, Inc.*

# **TABLE OF CONTENTS**

|      |                                                                                                                    | Page |
| ---- | ------------------------------------------------------------------------------------------------------------------ | ---- |
| I.   | NATURE AND STAGE OF THE PROCEEDINGS                                                                                | 1    |
| II.  | SUMMARY OF ARGUMENT                                                                                                | 1    |
| III. | STATEMENT OF FACTS                                                                                                 | 2    |
| IV.  | STATEMENT OF THE LAW                                                                                               | 2    |
| V.   | ARGUMENT                                                                                                           | 3    |
|      | A. The Patents Do Not Disclose Measurement Of DNA From Mixed Samples                                               | 3    |
|      | B. The Specification Does Not Show Possession Of Sequencing-By-Synthesis For Use With The Alleged Inventions       | 6    |
|      | C. The Specification Does Not Provide Written Description Support For Organ Transplant Testing                     | 8    |
|      | D. The Specification Does Not Describe The Alleged Invention As An Integrated Whole                                | 11   |
| VI.  | CONCLUSION                                                                                                         | 12   |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ariad Pharms. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010)............................................................................2, 9

*Flash-Control, LLC v. Intel Corp.*,
   2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021) ..................................11

*Fontem Ventures, B.V. v. NJOY, Inc.*,
   CV 14-1645-GW(MRWx), 2015 WL 12720306 (C.D. Cal. Oct. 22, 2015).....................................................................................................................7

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed.Cir.2007)................................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................2

*Trans Video Elecs., Ltd. v. Sony Elecs., Inc.*,
   822 F.Supp.2d 1020 (N.D. Cal. 2011)................................................................11

**Statutes**

FRCP 26(a)(2)(c) .........................................................................................................6

FRCP 56(a) ...................................................................................................................2

**I.    NATURE AND STAGE OF THE PROCEEDINGS**

Following the completion of fact and expert discovery, Defendant CareDx Inc. ("CareDx") now moves for summary judgment. *See* D.I. 48.

**II.   SUMMARY OF ARGUMENT**

Natera, Inc. ("Natera") has alleged infringement of three patents: U.S. Patent Nos. 10,597,724 ("the '724 Patent); 11,111,544 ("the '544 Patent"); and 10,655,180 ("the '180 Patent"). This motion addresses the invalidity of the '724 and '544 patents, which share largely overlapping specifications. The claims of these two patents fail the written description requirement for at least the following reasons:

1. Under Natera's construction, the patents require testing of DNA samples containing a mixture of DNA from two individuals, *i.e.*, mixed samples. The specifications do not describe this in the slightest.

2. The patent claims all require "sequencing-by-synthesis," but the specifications do not describe sequencing-by-synthesis for use with the invention.

3. Natera contends that the claims encompass analysis of samples from organ transplant recipients to detect transplant rejection. Yet, the specifications include no reference to organ transplant—none.

1

    4. There is no description of the claimed inventions as an integrated whole.

Summary judgment of invalidity is thus warranted

## III. STATEMENT OF FACTS

The pertinent facts are set forth in the accompanying concise statement of undisputed facts, and are referenced in the arguments below.

## IV. STATEMENT OF THE LAW

Under FRCP 56(a), the "court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The written description requirement assesses whether "disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The "hallmark of written description is disclosure," and requires "an objective inquiry into the four corners of the specification." *Id.* The "specification must describe an invention…and show that the inventor actually invented the invention claimed." *Id.* This "'ensure[s] that the scope of the right to exclude, as set forth in the claims, does not overreach the

2

scope of the inventor's contribution to the field of art as described in the patent specification.'" *Id.* at 1353-54.

V. **ARGUMENT**

A. **The Patents Do Not Disclose Measurement Of DNA From Mixed Samples**

The claims of the '724 patent recite "determining genetic data for DNA from a first individual in a biological sample of a second individual." Ex. 1 at claim 1. The asserted claims of the '544 patent include similar language. *See* Ex. 2 claims 21, 38. In view of this language, Natera contends that "the *claims* do not recite 'separate data' as CareDx proffers—they recite 'determining *the most likely genetic data* for DNA from the first individual' in a mixed sample, which indicates that data from more than one individual is being collected and analyzed." D.I. 76 at 55 (emphasis in original); *see also id.* at 7 (A "plain reading of the '724 and '544 Patent claims shows they recite methods for analyzing cfDNA in mixed samples generally—methods that can be broadly applied where cfDNA from more than one individual is present in a sample.").[1]

The specifications of the '724 and '544 patents, however, include no disclosure of the analysis of "mixed samples," wherein "data from more than one

---

[1] CareDx disputes this construction. *See* D.I. 76 at 39-53, 64-70.

individual is being collected and analyzed." Just the opposite, the patents disclose solely the analysis of samples that contain genetic data from *one* individual.

For instance, the patents contemplate using the alleged inventions for IVF treatment, wherein genetic data from an embryo is measured separately from genetic material from the parents, and the latter is used to more accurately estimate the genetic data of the former:

> A blastocyst is harvested from each embryo and the genomic data from the blastocysts are measured using an ILLUMINA BEAD ARRAY. Meanwhile, the diploid data is measure from tissue taken from both parents using MOLECULAR INVERSION PROBES….That data is then used, along with the father's diploid and haploid data to allow a highly accurate analysis of the genetic data of each of the blastocysts.

Ex. 1 at 59:28-46; *see also, e.g.*, *id.* at Abstract, 9:13-17, 19:65-20:3, 58:28-40, 58:59-59:2, 59:23-27, 59:47-66, 60:14-20. Nowhere, however, does the '724 patent contemplate the measurement of a "mixed sample" that contains DNA from multiple individuals.

In fact, even where the patents mention DNA sources that naturally include DNA from two individuals, they make excruciatingly clear that the DNA from each individual represented in the sample should be isolated and measured separately. For example, the patent includes a handful of references to plasma taken from the blood of a pregnant woman, which includes so-called "cell free DNA," consisting of DNA fragments from both the fetus and mother. Yet, in every instance, where such samples are mentioned, the patent is clear that the "fetal" material should be

4

first "isolated" from the sample and that the parental genetic material is measured separately. The example of Tay-Sachs disease in the patent illustrates this:

> Another example could be a situation where a pregnant woman whose husband has a family history of Tay-Sachs disease wants to know if the fetus she is carrying is genetically susceptible, but she does not want to undergo amniocentesis, as it carries a significant risk of miscarriage. She has her blood drawn, some ***fetal DNA is isolated from her blood***, and that DNA is analyzed using MIPs. ***She and her husband had already had their full genomic data analyzed previously and it is available in silico***. The doctor is able to use the in silico knowledge of the parental genomes and the method disclosed herein to clean the fetal DNA data, and check if the critical gene that is responsible for Tay-Sachs disease is present in the genome of the fetus.

*Id.* at 59:5-17. The patent is uniform in its teaching that "fetal" DNA is "isolated" from such sources. *See id.* at Abstract, 9:2-9, 9:28-32, 56:30-34. Nowhere does the specification contemplate measuring the "mixed sample."

Natera nonetheless points to "Method 1a" in columns 28 and 29 of the '724 patent as purportedly illustrating the analysis of mixed samples. *See, e.g.*, Ex. 3 ¶ 2; Ex. 4 at 55:25-56:17, 98:20-99:20. Method 1a, however, has nothing to do with the claimed inventions, and Natera's reliance on Method 1a is baseless.

All claims recite "determining the most likely genetic data…based on allele frequencies." Ex. 1 at claim 1. But Method 1a involves "Measuring Aneuploidy or Sex by Quantitative and Standard Techniques that ***do not Make Allele Calls***…" *Id.* at 29:8-10. So, Method 1a is irrelevant on its face. Moreover, Method 1a does not involve any form of sequencing, let alone the claimed "sequencing-by-

5

synthesis."   Perhaps most important, though, is that Method 1a, like every other example in the patent, does not involve analysis of mixed samples, such as cell-free DNA, that include DNA from more than one individual.

It is true, that Method 1a refers to two "mixed samples" consisting of DNA from 50 different cells that were mixed together.  *See id.* at 29:61-66.   But those "mixed samples" are not actually the test samples.   *See* Ex. 4 at 74:4-75:2. Instead, they are used as ***standards*** to generate distributions for subsequent testing of other samples.   *See id.* at 73:8-76:17.   Named inventor Matthew Rabinowitz, who submitted a Rule 26(a)(2)(c) disclosure regarding Method 1a, had no idea why "mixed samples" were used for this purpose.   *See id.* at 71:17-73:7.   Thus, to the extent Natera attempts to portray Method 1a (or any other similar method) as being about testing of "mixed samples," this is just misdirection.

### B. The Specification Does Not Show Possession Of Sequencing-By-Synthesis For Use With The Alleged Inventions

All asserted claims require the performance of "sequencing-by-synthesis," which is used to sequence amplified DNA products of particular loci from the sample that contains DNA from two individuals.   The specification, however, never describes sequencing-by-synthesis for use with the invention.

Just the opposite, the patent includes only a ***single reference*** to "sequencing by synthesis," and this one reference comes in the "Description of the Related Art," not the description of the alleged invention.   And, this sole reference to

6

"sequencing by synthesis" criticizes the technique as not being "conducive to high-throughput parallel analysis:"

> Pyrosequencing, or sequencing by synthesis, can also be used for genotyping and SNP analysis. The main advantages to pyrosequencing include an extremely fast turnaround and unambiguous SNP calls, ***however, the assay is not currently conducive to high-throughput parallel analysis***.

Ex. 1 at 5:41-45. Thus, if anything, the patent teaches away from using sequencing-by-synthesis. There is not a single working example in the '724 or '544 patents that involves the use of sequencing-by-synthesis. *See, e.g.*, Ex. 5 at 146:14-15 ("I do not believe there are any descriptions of the use of sequencing by synthesis as a demonstrated example.").

This fact pattern warrants summary judgment of lack of written description. *See, e.g.*, *Fontem Ventures, B.V. v. NJOY, Inc.*, CV 14-1645-GW(MRWx), 2015 WL 12720306, at *6-*7 (C.D. Cal. Oct. 22, 2015) (finding claims invalid for lack of written description where specification taught away from using fiber material in favor of a container made of a material that would prevent the penetration of nicotine.); *see also Liebel–Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed.Cir.2007) (finding claims invalid for lack of enablement because the specification taught away from a claimed embodiment, and testimonial evidence was given that such system could not have been produced at the time of filing).

    **C.    The Specification Does Not Provide Written Description Support For Organ Transplant Testing**

As noted above, Natera contends that its claims encompass the analysis of so-called "mixed samples" that include DNA from multiple individuals. *See supra* Part V.A. Such "mixed samples," Natera's expert contends, arise in the context of pregnancy, cancer, infectious disease, and, most important here, organ transplant. *See* Ex. 6 ¶¶ 43, 44, 45, 63. The sole accused products in this case are organ transplant products that measure cell-free DNA comprising nucleic acid fragments from both an organ donor and recipient.

Yet, Natera's '724 and '544 patents describe almost none of the foregoing. While Natera's patents spend page after page on prenatal diagnosis, there is no discussion of cancer, nor is there any discussion of infectious disease. Likewise, the patents make no mention of anything related to organ transplant, despite the fact that Natera now contends its claims cover this.

It is unsurprising that such disclosure is absent from Natera's patents because Natera did no work on organ transplant until 2012, when a scientist named Tudor Constantin began working at Natera and attended a conference presentation by Stanford scientist Stephen Quake, where he learned of the possibility of monitoring organ transplant rejection using cell-free DNA. *See, e.g.*, Ex. 7; Ex. 8 at 83:21-23, 84:5-23, 85:25-86:8, 148:16-149:2, 145:24-146:5. This was seven years after the purported invention in 2005.

Throughout the case, Natera has attempted to explain away the lack of disclosure in its patents related to transplant by arguing that the methods disclosed therein for non-invasive prenatal testing can be easily applied to organ transplant. This, however, cannot defeat summary judgment as a matter of law, because, as noted above, "a description that merely renders the invention obvious" cannot substitute for actual disclosure. *Ariad*, 598 F.3d at 1352.

And, even if there were some legal support permitting Natera to avoid summary judgment based on such arguments, they do not apply here because Natera has admitted that non-invasive prenatal testing and organ transplant are not interchangeable. Natera's Senior Vice President of R&D testified that Natera had developed a ▮▮▮▮ model for transplant, and that the first time they had done this was in their 2021 Prospera product. *See* Ex. 9 at 155:12-22. As he explained, this required Natera to ▮▮▮▮ deal with the ▮▮▮▮ associated with the secondary source being a human and the fact that one is ▮▮▮▮ which required refining the PCR model. *Id.* at 155:23-156:23. As Mr. Gemelos confirmed, ▮▮▮▮ *Id.* at 148:21-149:8; *see also id*. at 155:23-157:2. As such, these techniques cannot possibly be disclosed in Natera's patents, which supposedly date back to 2005.

9

Natera likewise cannot now contend that this work to develop a ▆▆▆▆ model for transplant is merely routine work that need not be described because, in fact, Natera has sought to patent it separately. For instance, in 2018, Natera filed U.S. Provisional Application 62/693,833 entitled "Methods for Detection of Donor-Derived Cell-Free DNA." Ex. 10. This provisional eventually led to U.S. Patent No. 11,525,159, which bears the same name. Importantly, both the provisional and issued patent state that "there is a need for a non-invasive test for transplantation rejection that is more sensitive and more specific than conventional tests." *See* Ex. 10 at 10; Ex. 11 at 1:39-41. If it were really true that organ transplant testing was a routine extension of Natera's prenatal testing methods from 2005, Natera would not seek years later to separately patent transplant techniques, nor would it state that there was a "need" for such techniques.

As another example, in this case, Natera asserts the '180 patent, which expressly requires the analysis of DNA from a transplant recipient. *See* Ex. 12 at claim 1. During prosecution, the claims were rejected in view of prenatal testing prior art, including the Oeth reference. *See* Ex. 13 at 6. Natera distinguished the prior art on the basis of it not disclosing the analysis of transplant DNA. *See id.* ("Moreover, Oeth merely relates to analysis of fetal cfDNA in a maternal plasma, but fails to teach or suggest anything about amplification and measurement of cfDNA of mixed origin comprising transplant DNA."). Again, if transplant were

10

interchangeable with prenatal diagnosis, Natera never would have argued to this effect and never would have sought to specifically claim transplant.

> D. **The Specification Does Not Describe The Alleged Invention As An Integrated Whole**

The written description requirement is not met when "the specification provides at best disparate disclosures that an artisan might have been able to combine in order to make the claimed invention." *Flash-Control, LLC v. Intel Corp.*, 2020-2141, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021). "Instead, the specification must present each claim as an 'integrated whole.'" *Id.* at *3. When "evaluating whether the written description requirement has been satisfied, a court does not simply look to see whether the specification contains descriptions of the individual elements of the claim. Rather, a court must look to see whether there is a written description for the entirety of the claimed invention—i.e., the combination of elements." *Trans Video Elecs., Ltd. v. Sony Elecs., Inc.*, 822 F.Supp.2d 1020, 1027 (N.D. Cal. 2011).

A search through the specification reveals no disclosure corresponding to the claimed inventions as an integrated whole. In fact, by Natera's own admission, the claims are affirmatively at odds with the disclosure. For example, all patents recite "determining the most likely genetic data for DNA from the first individual based on "allele frequencies." *See, e.g.*, Ex. 1 at claim 1. During claim construction Natera was clear that "[w]ithout mixed sample, you wouldn't even have allele

11

frequencies." D.I. 96 at 32:2-3. As detailed above, however, the specification includes no description whatsoever involving the analysis of mixed samples. *See supra* Section V.A. The failure of the specification to include any disclosure supporting the claims of the integrated whole further warrants summary judgment.

## VI.  CONCLUSION

CareDx's motion should be granted.

| | |
|---|---|
| Dated:   August 11, 2023 | Respectfully submitted,<br><br>FARNAN LLP<br><br>*/s/ Brian E. Farnan*<br>Brian E. Farnan (Bar No. 4089)<br>Michael J. Farnan (Bar No. 5165) |
| OF COUNSEL:<br><br>Edward R. Reines<br>Derek C. Walter<br>WEIL, GOTSHAL & MANGES LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065<br>Tel: (650) 802-3000<br>Fax: Fax: (650) 802-3100<br><br>W. Sutton Ansley (admitted *pro hac vice*)<br>WEIL, GOTSHAL & MANGES LLP<br>2001 M Street, NW, Suite 600<br>Washington, DC 20036<br>Tel: (202) 682-7000<br>Fax: (202) 857-0940<br>sutton.ansley@weil.com | 919 N. Market St., 12th Floor<br>Wilmington, DE 19801<br>(302) 777-0300<br>(302) 777-0301 (Fax)<br>bfarnan@farnanlaw.com<br>mfarnan@farnanlaw.com<br><br>*Attorneys for Defendant, CareDx, Inc.* |

13

## **CERTIFICATION OF COMPLIANCE**

The foregoing document complies with the type-volume limitation of this Court's March 2, 2020 form Scheduling Order for All Cases. The text of this brief, including footnotes, was prepared in Times New Roman, 14 point. According to the word processing system used to prepare it, the brief contains 2,613 words, excluding the case caption, signature block, table of contents and table of authorities.

                                                             /s/ Brian E. Farnan
                                                          Brian E. Farnan (Bar No. 4089)

Dated: August 11, 2023