## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATERA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-38 (CFC) (CJB) |
| | ) | |
| CAREDX, INC. | ) | (CONSOLIDATED) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CAREDX, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50, AND NEW TRIAL UNDER FRCP 59

Dated:    May 1, 2024

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Nate Ngerebara (admitted *pro hac vice*)
August Melcher (admitted *pro hac vice*)
Concord Cheung (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

W. Sutton Ansley (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES, LLP
2001 M Street, NW Suite 600
Washington, DC 20036
(202) 682-7000

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendant, CareDx, Inc.*

## **TABLE OF CONTENTS**

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ......................................1

II.   SUMMARY OF ARGUMENT ...................................................................1

III.  LEGAL STANDARD ................................................................................1

IV.   ARGUMENT...........................................................................................2

      A.   The '544 Patent Lacks Written Description...........................................2

           1.   The Specification Lacks Description Of The Claimed Inventions As An Integrated Whole ...........................................2

           2.   "Sequencing-by-Synthesis" Is Not Described, Either Individually Or For Use With The Invention .............................6

           3.   The Specification Does Not Describe Sequencing Intermixed Samples Or Analysis Of Data From Unrelated Individuals As In Transplant Testing........................9

      B.   The '180 Patent Lacks Written Description........................................12

           1.   The Patent Fails To Teach The Claims As An Integrated Whole ...................................................................13

           2.   The Patent Claims, But Does Not Teach, A Method That Fails To Minimize Primer Dimers .............................................14

      C.   The '180 Patent Claims Ineligible Subject Matter ..............................16

      D.   Foreign Damages Were Improper .....................................................19

      E.   The Jury's Award of $83,679,521 In Lost Profits Is Unsupported and Excessive ................................................................19

      F.   In The Alternative, The Court Should Order A New Trial Or Remittitur Of Damages ...................................................................21

V.    CONCLUSION.....................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ...................................................................…..16

*Ariad Pharms. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ...................................................2, 13

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) ...............................................17, 18

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
35 F.4th 1328 (Fed. Cir. 2022) ...........................................................16

*CareDx, Inc. v. Natera, Inc.*,
563 F.Supp.3d 329 (D. Del. 2021)......................................................16

*Chiron Corp. v. Genentech, Inc.*,
363 F.3d 1247 (Fed. Cir. 2004) ..........................................................21

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
760 Fed. Appx. 1013 (Fed. Cir. 2019)................................................18

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) ............................................................3

*Flash-Control, LLC v. Intel Corp.*,
2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021) ...............2, 4

*Flexuspine, Inc. v. Globus Med., Inc.*,
879 F.3d 1369 (Fed. Cir. 2018) ..........................................................19

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016) ..........................................................18

*Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*,
100 F.3d 1353 (7th Cir. 1996) ............................................................19

ii

*Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
   976 F.2d 1559 (Fed. Cir. 1992) ...........................................................20

*Novozymes A/S v. DuPont Nutrition*,
   723 F.3d 1336 (Fed. Cir. 2013) ........................................................2, 4

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996) ...........................................................21

*Rivera v. Int'l Trade Comm'n*,
   857 F.3d 1315 (Fed. Cir. 2017) ........................................................8, 9

*Shockley v. Arcan, Inc.*,
   248 F.3d 1349 (Fed. Cir. 2001) .........................................................19

*Tronzo v. Biomet, Inc.*,
   156 F.3d 1154 (Fed. Cir. 1998) .........................................................16

*Tucker v. Spalding*,
   80 U.S. 453 (1871)..............................................................................19

**Other Authorities**

Fed. R. Civ. P. 50(b) ...................................................................................1

Fed. R. Civ. P. 59 .......................................................................................1

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Defendant CareDx respectfully moves for JMOL on the jury's January 26, 2024 verdict in favor of Natera, Inc. ("Natera"), or in the alternative, a new trial or remittitur of damages.

## II.    SUMMARY OF ARGUMENT

The jury made fundamental errors as a matter of law that the Court should correct.    Chief among them is Natera's written description violations stemming from its abusive late-claiming that reflect the artifice of its patent attorneys rather than the innovation of its named inventors.    The written description requirement is a vital safeguard against such mischief.    And, here, there is no disclosure of the claimed invention as an integrated whole or even its constituent elements.    Indeed, Natera's expert acknowledged that the claimed inventions were like a "puzzle" that would need to be assembled from different pieces in the specifications.    That is a textbook violation of the written description requirement as a matter of law.

For this and the reasons below, the Court should grant JMOL, or in the alternative, order a new trial or remittitur of damages.

## III.    LEGAL STANDARD

JMOL is proper if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."    FRCP 50(b). A court may also "grant a new trial."    FRCP 59.

1

## IV.    ARGUMENT

### A.    The '544 Patent Lacks Written Description

Natera contends that the '544 patent covers a wide-ranging array of distinct approaches to analyzing cfDNA, including techniques for finding the "genetic data" of a fetus, a tumor, and even an organ transplant donor.    Natera asserts it made these supposedly vast inventions in 2006, but did not seek to patent claims covering them until 2020.    Natera's late-filed and overbroad claims fail the written description requirement.    No reasonable juror could conclude otherwise.

### 1.    The Specification Lacks Description Of The Claimed Inventions As An Integrated Whole

To satisfy the written description requirement, the claimed invention must be disclosed "as an integrated whole rather than as a collection of independent limitations."    *Novozymes A/S v. DuPont Nutrition*, 723 F.3d 1336, 1349 (Fed. Cir. 2013).    A patentee cannot use "an amalgam of disclosures plucked selectively" from the specification to meet the written description requirement.    *Id.*; *Flash-Control, LLC v. Intel Corp.*, 2020-2141, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021) (A "patent owner cannot show written description support by picking and choosing claim elements from different embodiments that are never linked together in the specification.").    A "description that merely renders the invention obvious" cannot substitute for actual disclosure.    *Ariad Pharms. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010).    The '544 patent fails that test.

2

At the outset, there is a fundamental mismatch between the specification and the claims. Consistent with the patent's title, a "System and method for cleaning noisy genetic data and determining chromosome copy number," the specification overwhelmingly teaches that the purported invention is data-processing techniques "in which imperfectly measured genetic data of a target individual are made more accurate by using known genetic data of genetically related individuals." PTX3 at Title, 2:23-27. The specification is packed with mathematical formulae that allow the use of "expected similarities between the genetic data of the target individual and the genetic data of *related individuals*, to clean the noise in the target genome." *See, e.g.*, PTX3 at 18:30-42:35. But the asserted claims of the '544 patent are devoid of elements directed to the particulars of computational steps, likely in recognition of the fact that "methods which can be performed entirely in the human mind are unpatentable." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011).

The specification never sets forth the method that is actually recited in the claims. The patent claims a laboratory method in which a sample containing "cell-free DNA" from two individuals is "amplif[ied]" and then "analyz[ed]" using "sequencing by synthesis" to determine "allele frequencies." The "allele frequencies" are then used to "determin[e]"—by any math method whatsoever—the "most likely genetic data" for DNA from a "first" of the two individuals.

3

The specification supports none of this. As documented below, the specification fails to support the individual techniques recited in the claims. *See, e.g., infra* Part IV.A.2 (describing lack of support for "sequencing-by-synthesis"); *infra* Part IV.A.3 (describing lack of support for "cell-free DNA," use of samples with DNA from two individuals, and organ transplant). And, even more broadly, the specification does not support the claims as an integrated whole.

Indeed, CareDx's expert, Dr. Brian Van Ness, testified there is nothing in the '544 patent that describes the combination of steps in the claims as an integrated whole. *See* Tr. at 813:17-815:16, 819:19-821:9. Natera's expert, Dr. John Quackenbush, addressed this key issue in only a single terse exchange, citing ***nothing*** from the specification. *See id.* at 1095:5-21. He instead opined that the requirement is satisfied if a specification discloses different "puzzle pieces being in different boxes" and a skilled artisan could then "look at puzzle pieces and figure out how they fit together." *Id.* at 982:24-983:13. He later testified that, from "the perspective of a person of ordinary skill in the art, if you look at the claims, right, you see how they fit together. You see worked examples of different pieces." *Id.* at 1095:5-21. This is the forbidden "amalgam of disclosures." *Novozymes*, 723 F.3d at 1349; *see also Flash-Control*, 2021 WL 2944592, at *3 (an "'amalgam of disclosures' from which an artisan could have created the claimed invention does not satisfy this requirement").

4

Dr. Quackenbush even admitted that his original expert report cited nothing in the specification describing the claims as an integrated whole. *See* Tr. at 1216:24-1218:2 ("There's no citation there to the patent.").

Natera inventor Matthew Rabinowitz and Dr. Quackenbush referred to the specification's brief discussion of a mathematical technique known as "matched filtering," which appears as Methods 1(a) and 1(b). *See* PTX3 at 55:41-62:22. They apparently cited this as being pertinent to cfDNA analysis because it involved experiments using so-called "mixed samples." *See* Tr. 214:2-215:9, 1089:9-1091:5. But, notably, neither Dr. Rabinowitz nor Dr. Quackenbush testified that the "matched filtering" disclosure could support the claims as an integrated whole. *See id.* at 1095:5-21.

It could not. While the claims require "sequencing-by-synthesis" of "cell-free DNA" to generate "allele frequencies," Methods 1(a) and (b) disclose none of this:

- Methods 1(a) and 1(b) do not use any form of sequencing but instead a "Taqman" assay. PTX3 at 56:22-23, 60:26-27.
- Methods 1(a) and 1(b) do not involve cfDNA, but rather one sample having 50 cells from 50 different males and a second sample having 50 cells from 50 different females. *Id.* at 56:26-30, 60:26-31. Dr. Rabinowitz, had no idea why Natera used such samples and acknowledged that Methods 1(a) and 1(b) did not involve finding the genetic data for any one of the individual cells. Tr. at 1220:6-1222:20.

- Methods 1(a) and 1(b) cannot measure "allele frequencies" because they "do not Make Allele Calls." PTX3 at 55:42, 59:64; *see also* Tr. at 810:24-813:16 819:19-820:9.

- Methods 1(a) and 1(b) are about "Measuring Aneuploidy or Sex," not organ transplant. PTX3 at 55:41-43, 59:63-65; Tr. 311:6-8.[1]

As Dr. Van Ness explained, Methods 1(a) and 1(b) do not disclose a single element of the claims. *See* Tr. at 819:23-822:11. Natera has thus failed to identify any support for the claims as an integrated whole, as the law requires. JMOL is therefore warranted.

## 2. "Sequencing-by-Synthesis" Is Not Described, Either Individually Or For Use With The Invention

The "sequencing-by-synthesis" claim element further confirms that Natera has failed the written description requirement. While the claims require "sequencing-by-synthesis," the portions of the specification where the alleged invention is supposedly described do not mention that concept at all. "Sequencing-by-synthesis" is never mentioned, for instance, in the "Summary of the Invention" or the "Detailed Description of the Preferred Embodiment."

Instead, Natera points to a single reference to "sequencing-by-synthesis" in the background section: "Description of the Related Art." Yet that sole reference

---

[1] During the '180 prosecution, Natera distinguished prior art because it "merely relat[es] to analysis of fetal cfDNA in [] maternal plasma, but fail[s] to teach or suggest anything about amplification and measurement of cfDNA of mixed origin comprising transplant DNA." DTX1321.1117.

to "sequencing by synthesis" teaches *away* from it by criticizing the technique as "not currently conducive to high-throughput parallel analysis." PTX3 at 8:41-45. The specification also provides no working examples involving sequencing-by-synthesis, confirming it is not part of the invention. D.I. 447 ¶ 53; Tr. 1212:6-1213:11.

Dr. Quackenbush did not deny that the specification teaches away from "sequencing-by-synthesis" and admitted that there are no examples using "sequencing-by-synthesis." *See* Tr. 1212:19-22.

Dr. Quackenbush provided a passing reference to "mini-sequencing" and the conclusion that sequencing-by-synthesis was a "well-known method" that a POSA "would clearly understand that it was well described in the patent." *Id.* 985:13-987:6. That is not sufficient either. Dr. Quackenbush said nothing substantive about "mini-sequencing," which, like "sequencing-by-synthesis," is mentioned solely in the "Description of the Related Art," not where the alleged invention is described. *See* PTX3 at 4:3:21, 7:21-35. Rather than being described for use with "cell-free DNA," the patent describes "mini-sequencing" as being useful for "single-cells," *id.* at 4:5, 7:22, and laments that it requires a high "quality of the DNA preparation." *Id.* at 4:9, 7:26. The patent goes on to state that there is a need for "better methods" to analyze "one or a small number" of cells or a "single cell." *Id.* at 4:19-21, 7:30-31. Nothing in the patent contemplates using "mini-sequencing"

for the analysis of "cell *free* DNA" in the alleged invention.    Dr. Quackenbush's assertion that "sequencing-by-synthesis" was "well-known" likewise fails because the "knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1322 (Fed. Cir. 2017).

Even if one assumes "sequencing-by-synthesis" was "well-known," Dr. Quackenbush thoroughly negated any suggestion that a POSA would view the '544 patent's sole negative reference as possession of this technique for use in the claims, which require "cell-free DNA."    Dr. Quackenbush testified that in 2006 sequencing-by-synthesis of "low abundance" cfDNA was "incredibly challenging":

- Applying sequencing-by-synthesis to cell-free DNA "was a problem that *people hadn't yet come up with good routine solutions* for." Tr. 1112:7-15.

- Sequencing-by-synthesis "*wasn't conventional*…in applications to cell-free DNA."    *Id.* at 1115:10-1116:7.

- Translating techniques from abundant genomic DNA to low-abundance cell-free DNA "is *an incredibly challenging issue*." *Id.* at 970:1-25.

- The "real challenge is in this low-abundance cell-free DNA."    *Id.* at 1116:16-1117:8.

- "[A]pplying these techniques when you have really low signal is hard."    *Id.* at 1118:7-19.

- "[S]omething which works well in one context won't necessarily work well, here."    *Id.* at 1162:5-18.

8

- Commercial sequencing "instruments were on the verge of coming….But…definitely not been applied to this low-abundance DNA."   *Id.* at 1112:16-1113:15.
- "[W]e struggled with" "trying to analyze cell-free DNA in tumors" "because of…the low abundance."   *Id.* at 1111:20-1112:6.

Given such testimony—and the absence of any actual disclosure to overcome these challenges—no reasonable juror could accept Dr. Quackenbush's conclusory testimony that sequencing-by-synthesis was "well-known" in this context.

At bottom, no reasonable juror could conclude from a single disapproving reference to "sequencing-by-synthesis" that the inventors possessed the combination of "sequencing-by-synthesis" for use with "cell-free DNA" to measure "allele frequencies," as the claims require.

### 3.    The Specification Does Not Describe Sequencing Intermixed Samples Or Analysis Of Data From Unrelated Individuals As In Transplant Testing

For a specification to support the claims as a whole, it is not enough for it to have disclosure supporting one or a few embodiments.   Rather, the specification must support "the full breadth of the asserted claims."   *See Rivera*, 857 F.3d at 1319.   The asserted claims broadly cover sequencing to then analyze a mixed sample that includes "cell-free-DNA" from a "first" and "second" individual, without requiring that the two individuals be genetically related.   Yet the specification fails to support either (1) sequencing of a sample with ***intermixed***

cfDNA; or (2) deriving the "most likely genetic data" for one individual based on genetic information about another person who is genetically ***unrelated***.

First, the specification solely teaches a method of analyzing separate samples of genetic data from related individuals: "Poorly or incorrectly measured base pairs, missing alleles and missing regions are reconstructed using expected similarities between the target genome and the genome of genetically related individuals." PTX3 at Abstract.    Natera's patent terms this technique "Parental Support," which, as Dr. Van Ness explained, requires separate samples of isolated fetal and isolated parental or other related individual DNA.    *See* Tr. at 792:4-793:22, 802:18-809:6.

This holds true throughout the patent, even in its references to cfDNA from a pregnant woman, which contains DNA from both the mother and fetus.    Dr. Van Ness explained that, here, the '544 patent does not describe sequencing the intermixed sample.    Rather, it describes a different process of first ***isolating*** the fetal DNA so that it is in a separate sample from the maternal DNA, and then analyzing the fetal DNA apart from the sample with maternal DNA.    *See id.* at 806:12-807:6.    Thus, even where the patent refers to a sample with a mixture of DNA from two individuals, it teaches that they must be first unmixed before they can be used for the methods described in the patent.    The claims, however, include no such "unmixing" step.    Just the opposite, they require sequencing and analysis of an intermixed sample.

10

Natera presented no evidence to rebut the foregoing. Natera agrees the '544 patent includes no working examples involving cfDNA, let alone such an example involving a sample having intermixed DNA from two individuals. *See* D.I. 447 ¶ 54. Dr. Quackenbush's testimony was in accord. *See* Tr. at 1212:12-14. And Dr. Quackenbush nowhere rebutted Dr. Van Ness's testimony that, even where the patent refers to cfDNA, it always describes first isolating the fetal DNA from maternal DNA to convert the mixed-sample into a non-mixed-sample. *Id.* In sum, no reasonable juror could conclude that the specification describes sequencing and analyzing "cell-free DNA" from a mixed sample containing DNA from two individuals.

Second, the specification further fails because it nowhere describes analysis of the genetic information of ***unrelated*** individuals, and thus nowhere describes transplant analysis. The '544 patent never once refers to "transplant" and there is no dispute that there are no working examples involving transplant. D.I. 447 ¶¶ 51-52; Tr. at 1212:6-1213:11.

At trial, CareDx's expert, Dr. Van Ness, documented the total lack of written description with regard to organ transplant. Tr. at 798:16-802:11. He explained that the specification solely teaches "Parental Support" "in which imperfectly measured genetic data of a target individual are made more accurate by using known genetic data of ***genetically related individuals***." PTX3 at 2:23-27. The

11

specification includes page after page of descriptions of algorithms for "reconstruct[ing]" "poorly or incorrectly measured" genetic data for one person by "using expected similarities between the target genome *and the genome of genetically related individuals*." *Id.* at Abstract, 12:21-53. It nowhere explains how to reconstruct genetic data of one person from data about another person who is genetically *unrelated.*

This vacuum in the disclosure when it comes to transplant is a product of the fact that Natera did not possess transplant rejection testing in 2006, the claimed priority date. As Natera scientist Bernhard Zimmerman explained, nobody within Natera thought to work on transplant until he and another scientist, Tudor Constantin, saw a presentation by Stanford scientist Stephen Quake in the 2012 timeframe. *See* Tr. 603:6-608:10.

Natera itself did not claim to have invented an organ transplant test until its 2018 provisional application, which stated there was "a need for a noninvasive test for transplantation rejection that is more sensitive and more specific than conventional tests." *Id.* 621:25-627:23; DTX 1297-011. Dr. Quackenbush failed to contest this. *See generally* Tr. 984:14-989:15, 1088:22-1095:21.

**B.    The '180 Patent Lacks Written Description**

The claims of the '180 patent are directed to the analysis of cfDNA from a "transplant," wherein one performs "targeted PCR amplification" of the DNA using

more than "100 PCR primer pairs" associated with genetic loci from "chromosomes 1, 2, or 3."    PTX5 at claim 14.    Like the '544 patent, the '180 patent fails the written description requirement.    No reasonable juror could conclude otherwise.

### 1.    The Patent Fails To Teach The Claims As An Integrated Whole

Like the '544 patent, the '180 patent lacks written description for the claims as an integrated whole.    As Dr. Van Ness explained, the asserted claims require, for instance, "transplant" and the use of SNP loci on "chromosomes 1, 2, or 3."    But the specification never discusses this group of chromosomes for anything, let alone the claimed methods; at most it discusses *some* of these chromosomes for prenatal testing, but never transplant.    *See* Tr. at 826:22-830:8.    As Dr. Van Ness further explained, the specification includes nothing that puts together as a coherent whole any of the other claim elements either.    *See id.* at 830:9-831:19.

Dr. Quackenbush again pointed to ***nothing*** in the '180 specification. Instead, he argued that "you have to apply the perspective of a [POSA] to ***try to understand how the pieces fit together in this puzzle*** to describe…Claim 14 and 15 of the '180 Patent."    *Id.* 1154:21-1155:5.    As set forth above, that approach fails as a matter of law because a disclosure that merely renders claims obvious is insufficient for written description.    *Ariad*, 598 F.3d at 1352.

To the extent Dr. Quackenbush addressed whether the specification discloses "chromosomes 1, 2, or 3," he pointed to a disclosure of chromosomes 1 to 16 in a

background mathematics section.     *See* Tr. 1158:24-1159:8; PTX5 at 165:65-166:10.    But that disclosure has nothing to do with the claimed "transplant," but rather calculation of "child fraction" for prenatal testing.    Dr. Quackenbush's need to selectively pluck disclosures in the '180 patent related to prenatal testing and try to shoehorn that disclosure into support for "transplant" illustrates again how Natera's specification does not support the claims as a whole.

### 2.     The Patent Claims, But Does Not Teach, A Method That Fails To Minimize Primer Dimers

The claims also fail the written description requirement because it is uncontested that the "claims of the '180 Patent do not include any requirement for selection of primers to avoid primer side products."    D.I. 447 ¶ 59; Tr. 1155:17-23.[2]    The claims are completely open-ended as to the "primer pairs" that may be used for the "targeted amplification."

The specification, however, is the exact opposite.    It explains that the alleged invention is the selection of specific primers that allows the claimed "targeted PCR amplification" of more than 100 targets by eliminating side products.    The specification states that such primer selection "***unexpectedly enabled*** extremely high

---

[2] Natera's stipulation to this effect stems from the claim construction proceeding, where the Court itself secured Natera's admission that the claims are not limited to the use of primer selection to avoid side products, but rather include embodiments that do not involve such techniques.    *See* D.I. 96 at 111:11-112:20.

14

PCR multiplexing levels" and that the purported invention "is based in part on the **surprising discovery** that often only a relatively small number of primers…are responsible for a substantial amount of" unwanted side products.[3]    PTX5 at 46:28-42, 48:5-8.    The specification even states that primer selection techniques are "**essential**," criticizing prior art that omits such methods as being "dominate[d]" by garbage side products.    *Id.* at 54:41-45.

At trial, Dr. Van Ness, described the primer side-product problem the patent purports to overcome and how the specification confirms that the inventors possessed **only** a method that required primer selection to avoid primer side products so as to allow high multiplexing.    Tr. at 831:20-840:3.    Lead inventor Bernhard Zimmerman confirmed point-blank that he **never** possessed a method of practicing the claims without the primer selection techniques.    *See id.* at 698:11-19.

Dr. Quackenbush likewise failed to address this deficiency.    *See id.* at 1155:24-1158:13.    Dr. Quackenbush testified solely regarding **different** PCR issues, such as allelic bias, jackpotting, and bottlenecking, as well as DNA polymerase selection methods.    *See id.* at 1155:24-1158:13.    As to the specification's disclosure that primer selection was "unexpectedly enabling" and "essential" for multiplex PCR, Dr. Quackenbush stated that "just because one thing

---

[3] Natera's corporate witness and '180 patent inventor, Dr. Zimmerman, testified that the claimed 100-plex amplification is "highly multiplex PCR."    Tr. 692:7-22.

is essential, it doesn't mean it's not important to focus on other things right?" *Id.* at 1158:5-7. His testimony concluded with a bizarre car analogy where he stated that "[i]f you have a flat tire, it's not going to be easy to drive…even if there's gas in your tank." *Id.* Simply put, Dr. Quackenbush did not address—and hence did not rebut—CareDx's testimony at trial.

This mismatch between the narrow specification—which emphasizes the "essential" nature of primer selection—and the overbroad claims constitutes a written description violation. *See, e.g.*, *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1342–44 (Fed. Cir. 2022) (failure of written description for claims directed to generic "eyelets" where specification taught that "fixed aperture" eyelet was essential and criticized "flexible" eyelets); *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1159 (Fed. Cir. 1998) (failure of written description for claimed genus encompassing any shape where specification "tout[ed] the advantages of [a] conical shape" and "specifically distinguishe[d] the prior art as inferior").

## C. The '180 Patent Claims Ineligible Subject Matter

Applying *Alice* step 1, the '180 patent is directed towards a natural phenomenon.

It generally claims methods for detecting the natural phenomenon of cfDNA from a first individual in a biological sample of a second individual. *CareDx, Inc. v. Natera, Inc.*, C.A. 19-567-CFC-CFB, D.I. 102-1 ¶ 2 (Quackenbush Decl.,

16

Appendix A to Natera's Concise Statement of Facts in Support of Its Motion for Summary Judgment of Invalidity under 35 U.S.C. § 101); *CareDx, Inc. v. Natera, Inc.*, 563 F. Supp. 3d 329, 342 (D. Del. 2021) ("It is undisputed that donor-specific cfDNA and the correlation donor-specific cfDNA has with organ rejection are natural phenomena."). Its claimed methods are remarkably similar in this regard to the cfDNA detection claims in *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376 (Fed. Cir. 2015). Those claims used amplification to detect paternally inherited DNA in maternal DNA so the DNA of one individual (fetus) can be detected in that of a second individual (mother). The Federal Circuit concluded that the Sequenom claims were "generally directed to detecting the presence of a naturally occurring thing or a natural phenomenon, cffDNA in maternal plasma or serum." *Id*. It follows that Natera's claimed methods are likewise directed to detecting the presence of a natural phenomenon.

As for *Alice* step two, the trial record conclusively showed that the '180 patent does not incorporate an inventive concept. The parties agreed that the extraction step was "well-understood, routine, and conventional." D.I. 454 at 6. As to the remaining steps, Natera did not dispute that at Natera's claimed priority date:

- "DNA amplification" was "routine." PTX3 at 60, Tr. 884-87, 893; Tr. 1115 (Natera's expert: amplification had been "widely used" for decades);
- "sequencing-by-synthesis…was a standard and conventional method for multiplex or high-throughput sequencing," Tr. 888, 893,

17

895; *id.* 341 (Natera submission stating sequencing-by-synthesis was "known as early as 1993 and [was] commercially available since at least 1999"); *id.* 1115 (Natera's expert: sequencing-by-synthesis "absolutely was" "conventional");

- "targeted PCR," including 100-plex amplification, was "routine and conventional," *id.* 698-701, 889-90, 893-95, 1160; D.I. 402 at 10 (Court noting on summary judgment that Dr. Quackenbush's testimony was conclusory regarding whether 100-plex PCR was routine and conventional); and

- "sequencing-by-synthesis" was "commercially available."    Tr. 340-341, 358, 892.

Confronted with the specification's failure to describe the complete method with respect to written description, Natera's expert responded by asserting that it still possessed the complete method because "you have to apply the perspective of a [POSA] to try to understand how the pieces fit together in this puzzle." *Id.* 1154:21-1155:5.    That is fatal under step 2.    *See Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1377 (Fed. Cir. 2016) (the "well-known" "physical steps of DNA amplification and analysis of the amplified DNA to provide a user with the sequence of the non-coding region do not, individually or in combination, provide sufficient inventive concept").

Natera's expert also claimed that it "wasn't routine and conventional" to "apply" the conventional tools disclosed in the claims "to cell-free DNA." *See, e.g.*, Tr. 1160.    But the Federal Circuit has reached the opposite conclusion, *see Ariosa*, 788 F.3d at 1377, supra p.4, and Natera's expert never explained how applying those tools to cfDNA differed from their conventional application, *see* Tr.

18

1115-19.   *Compare Cleveland Clinic Found. v. True Health Diagnostics LLC*, 760 Fed. Appx. 1013, 1019 (Fed. Cir. 2019) (finding patents ineligible where they "never suggest[ed] that any significant adjustments needed to be made [to the conventional technique] to accommodate its use for measuring" the phenomenon).    Accordingly, the claims are invalid for claiming ineligible subject matter under the *Alice* framework.

### D.    Foreign Damages Were Improper

The jury erred in awarding compensatory damages for foreign sales of AlloSeq.    This award ignores the final jury instructions, which require that "[d]amages can be awarded only on sales of products that you find that practice the patented methods in the United States."    D.I. 458 at 4; *Tucker v. Spalding*, 80 U.S. 453, 455 (1871) ("if [the jury] disregard[s] instructions, [the Court should] set aside their verdict"); *Flexuspine, Inc. v. Globus Med., Inc.*, 879 F.3d 1369, 1373–74 (Fed. Cir. 2018) ("The district court was entitled to find [jury's] answers inconsistent."). Natera adduced no evidence that any sale of AlloSeq was made in the United States. Moreover, Natera failed to show that any domestic infringement caused foreign sales such that the Court refused to instruct the jury on this legal theory.

### E.    The Jury's Award of $83,679,521 In Lost Profits Is Unsupported and Excessive

The jury's lost-profits award fails as a matter of law because there is insufficient evidence that Natera is entitled to lost profits.    *See Mid-Am.*

*Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1368 (7th Cir. 1996) ("Each one of these steps in the estimation of Mid–America's lost profits involves a substantial leap of faith…[or] outright guessing…and…render the award unreasonably speculative, excessive and unsupported by the evidence."); *see also Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001). The trial record lacks adequate evidence that "there was a reasonable probability that, but for the infringement, [Natera] would have made [CareDx's] sales." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992).

For instance, Natera assumed without basis that it (or Viracor) would have made every sale that CareDx did. Yet Natera's corporate representative on lost sales, Adam Prewett, testified that he could not even speculate how Natera's Prospera sales would be affected if CareDx's AlloSure was not available. Tr. 1468:5-12.

Further, Mr. Prewett, and Natera's expert, Lance Gunderson, testified that supporting clinical data is the most important thing for customers and doctors. *Id.* 1457:10-15, 1518:24-1519:3. But Gunderson admitted that the "higher quality clinical validation study performed by CareDx" was part of why AlloSure had a 70% market share as compared to Prospera's below 20% market share. *Id.* 1520-21. And he denied having an opinion as to whether the dubious Sarwal study supporting Prospera was considered by doctors as a "bad study" or a "good study." *Id.*

20

Gunderson thus provided no evidentiary basis to support the inference that Natera would have been as effective as CareDx in converting doctors and patients away from well-established rejection monitoring options, like DSA or biopsy.

Natera also lacked basis in assuming that approaches like DSA and biopsy were not an alternative to cfDNA testing even though only a few percent of the total addressable market uses cfDNA.   *Id.* 1514.   If the standard non-cfDNA techniques were not viable, they could not dominate the market.

Natera's attempt to quantify its losses is also legally flawed.   Mr. Gunderson admitted that CareDx created the market for transplant cfDNA assays.   *Id.* 1521:13-23.   Without that effort, Natera could not have achieved the sales it now claims it lost.   But Mr. Gunderson failed to include the almost $100 million that CareDx expended to create the market as part of the cost of its lost sales and other relevant costs.   *Id.* 1581:9-12.   The jury award thus provided Natera with an unearned windfall, improperly obtaining all of the gains with none of the costs.

*        *        *

The lost profits awarded by the jury were unsupported and excessive as a matter of law.   The Court should reverse the jury's award of lost profits damages.

## F.   In The Alternative, The Court Should Order A New Trial Or Remittitur Of Damages

"A trial court should grant a motion for a new trial if…the verdict is contrary to the great weight of the evidence."   *Chiron Corp. v. Genentech, Inc.*, 363 F.3d

1247, 1258 (Fed. Cir. 2004). Similarly, when "a jury damage award is excessive," a court may (a) "reverse the jury award and order a new trial" or (b) "allow plaintiff the option of agreeing to a remittitur in a specified amount." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996).

For all of the reasons above, the jury verdict is contrary to the great weight of the evidence and the damage award is excessive. To the extent the Court does not grant JMOL in CareDx's favor, the Court should order a new trial or allow Natera the option of agreeing to a remittitur.

## V.    CONCLUSION

For these reasons, the Court should grant JMOL in favor of CareDx. In the alternative, the Court should order a new trial or allow Natera the option of agreeing to a remittitur.

Dated:   May 1, 2024

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter(admitted *pro hac vice*)
Nate Ngerebara (admitted *pro hac vice*)
August Melcher (admitted *pro hac vice*)
Concord Cheung (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

W. Sutton Ansley (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES, LLP
2001 M Street, NW Suite 600
Washington, DC 20036
(202) 682-7000

*Attorneys for Defendant, CareDx, Inc.*

23

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief has been prepared in Times New Roman 14-point typeface using Microsoft Word, and contains 4,948 words as determined by the Word Count feature of Microsoft Word.

Dated: May 1, 2024

*/s/ Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)