IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATERA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-038 (CFC) (CJB) |
| | ) | (CONSOLIDATED) |
| CAREDX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**NATERA'S ANSWERING BRIEF IN OPPOSITION TO MOTION FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE,
<u>MOTION FOR NEW TRIAL</u>**

OF COUNSEL:

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA  94065
(650) 801-5000

Andrew M. Holmes
Jeff Nardinelli
Jocelyn Ma
Andrew E. Naravage
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600

Sandra L. Haberny, Ph.D.
Sarah M. Cork, Ph.D.
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

May 31, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Natera, Inc.*

Bianca Fox
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

Abigail E. Clark
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
2601 South Bayshore Dr., Suite 1550
Miami, FL 33133
(305) 402-4880

## **TABLE OF CONTENTS**

Page

I.    SUMMARY OF THE ARGUMENT .................................................1

II.   LEGAL STANDARDS ...........................................................1

III.  ARGUMENT........................................................................2

A.    Sufficient Evidence Supported The Jury's Finding Of Adequate Written Description Support ................................................2

1.    Sufficient Evidence Showed A POSA Would Understand The '544 Patent Discloses The Claimed Methods.....................3

2.    Natera Presented Sufficient Evidence That The '544 Patent's Written Description Supports Specific Claim Elements.................................................................8

3.    The Jury Heard Ample Evidence That The Asserted Claims Of The '180 Patent Are Not Invalid Under Section 112................................................................14

B.    The '180 Patent Is Patent-Eligible Under Section 101 .......17

C.    Damages .......................................................................20

1.    Foreign Damages ...............................................20

2.    Lost Profits ........................................................20

3.    Remittitur ..........................................................22

IV.   CONCLUSION....................................................................23

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Alcon Research Ltd. v. Barr Labs., Inc.*,
    745 F.3d 1180 (Fed. Cir. 2014) ...................................................................5

*Amgen Inc. v. Sanofi*,
    227 F.Supp.3d 333 (D. Del. 2017)...........................................................2

*Amgen Inc. v. Sanofi*,
    No. CV 14-1317-RGA, 2019 WL 4058927 (D. Del. Aug. 28, 2019) .................3

*Ariad Pharms. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) ..........................................................4, 5, 12

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
    788 F.3d 1371 (Fed. Cir. 2015). ..........................................................17

*Board of Trustees of Leland Stanford Junior Uni. v. Chinese Uni. of Hong Kong*,
    860 F.3d 1367 (Fed. Cir. 2017) ..........................................................5, 6

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
    320 F.3d 1339 (Fed. Cir. 2003) ..........................................................2

*Carnegie Mellon Uni. v. Marvell Tech. Grp.*,
    807 F.3d 1283 (Fed. Cir. 2015) ..........................................................20

*Deere & Co. v. Agco Corp.*,
    659 F. Supp. 3d 418 (D. Del. 2023).......................................................1

*Flash-Control v. Intel Corp.*,
    2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021) ...............................6, 7

*Marra v. Philadelphia Hous. Auth.*,
    497 F.3d 286 (3d Cir. 2007) ..........................................................1, 14

*MorphoSys AG v. Janssen Biotech, Inc.*,
    358 F. Supp. 3d 354 (D. Del. 2019).......................................................12, 13

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
    723 F.3d 1336 (Fed. Cir. 2013) ....................................................3, 5, 6

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
    575 F.2d 1152 (6th Cir. 1978) ....................................................20, 21

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016) ........................................................19

*ScriptPro LLC v. Innovation Associates, Inc.*,
    833 F.3d 1336 (Fed. Cir. 2016) ..........................................................5

*Williamson v. Consol Rail Corp.*,
    926 F.2d 1344 (3d Cir. 1991) ........................................................2, 8

## I.    SUMMARY OF THE ARGUMENT

CareDx's JMOL (D.I. 486, "Br.") has not come close to demonstrating that no reasonable jury could find:  (1) it failed to establish invalidity by clear and convincing evidence, or (2) Natera is entitled to the damages the jury awarded. Even CareDx's cherry-picked evidence from trial establishes the opposite of CareDx's argument—it shows the jury's verdict was proper.  The written description, routineness and conventionality, and damages inquiries are factual. The jury considered the facts and resolved the disputes in Natera's favor. CareDx's motion should be denied.

## II.    LEGAL STANDARDS

"To grant judgment as a matter of law in favor of a party with the burden of proof," as CareDx bore on invalidity here, "the court must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] but additionally that there is *insufficient evidence for permitting any different finding*."  *Deere & Co. v. Agco Corp*., 659 F. Supp. 3d 418, 438 (D. Del. 2023) (cleaned up).[1]  JMOL presents a "narrow inquiry," in which the reviewing court "must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury."  *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  In assessing the

---

[1]  Emphasis added unless otherwise indicated.

sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991).

## III.    ARGUMENT

### A.    Sufficient Evidence Supported The Jury's Finding Of Adequate Written Description Support

Written description, "like any other ground of invalidity, must be established by clear and convincing evidence." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1353 (Fed. Cir. 2003).  CareDx's burden on this JMOL motion is "doubly high: it must show that no reasonable jury could have failed to conclude that [CareDx's] case had been established by clear and convincing evidence." *Id.*  CareDx failed to meet this burden.  The jury heard copious evidence supporting its conclusion that the '544 and '180 Patents meet the §112 written description requirements.  *See* Br., §§IV.A-B.

At most, as detailed below, "[t]he parties' experts provided the jury with competing testimony on the interpretation of the data available in the specification" and based on this evidence, "[t]he jury concluded that the asserted claims were not invalid for lack of written description." *Amgen Inc. v. Sanofi*, 227 F.Supp.3d 333, 348 (D. Del. 2017).  The Court here should follow *Amgen's* teachings and refuse to

(i) re-weigh the evidence or (ii) overrule the jury's findings.  Like in *Amgen*, Natera's experts "provided more than conclusory testimony in order to explain their respective conclusions to the jury" and "[t]he jury credited such testimony over that of defendants' experts."  *Id*.  CareDx failed to provide clear and convincing evidence that a POSA would not recognize the claimed invention in the written description, and the jury was entitled to rule in Natera's favor.  *See* D.I. 460 at 5*; see also Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, 2019 WL 4058927, at *2 (D. Del. Aug. 28, 2019) (denying JMOL because "substantial evidence in the record supports the jury verdict of validity" and "[t]he jury was entitled to credit the testimony of Plaintiffs' experts").

### 1.    Sufficient Evidence Showed A POSA Would Understand The '544 Patent Discloses The Claimed Methods

Adequate written description requires that the patent "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed."  *Novozymes A /S v. DuPont Nutrition Biosciences APS,* 723 F.3d 1336, 1356 (Fed. Cir. 2013) (citation omitted).  This standard was presented to the jury, and Dr. Van Ness endorsed it.  *See* D.I. 468, 941:4-8.

The jury heard Dr. Van Ness' definition for a POSA in this case:  "a PhD in genetics, molecular biology, bioinformatics or related field, and at least three years of research in an academic or industry setting, including at least two to three years of research experience in the field of human genomics," along with knowledge and

experience in the highly-specialized subject matter of the '544 and '180 Patents. D.I. 468, 941:20-942:7. Dr. Quackenbush largely agreed. D.I. 469, 1228:9-19.

Natera presented adequate evidence for a jury to find that a POSA with this pedigree could conclude from the '544 Patent that the inventors possessed the claimed invention. That evidence included, by way of non-limiting example:

- Expert testimony that the hypothetical POSA would be highly skilled and experienced, and would be able to understand that the '544 Patent discloses the claimed method and that its elements operate together (D.I. 469, 1094:8-14, 1095:17-21; D.I. 466);

- Drs. Quackenbush and Rabinowitz's testimony that the '544 Patent describes the "Matched Filter" method, which does not require knowledge of the genetics of related individuals (D.I. 466, 214:2-215:9; D.I. 467, 317:18-318:8; D.I. 469, 1089:9-1091:2, 1094:3-1095:4);

- Documents and testimony demonstrating Natera's NIPT workflow is fundamentally the same as its transplant workflow, showing Natera possessed a working analytical method applicable to both fetal and transplant samples (D.I. 467, 577:11-23; D.I. 468, 1092:18-1093:4 (quoting PTX-0415); D.I. 469, 1093:19-2, 1164:14-25 (citing PTX-0124)); and

- Dr. Rabinowitz's testimony that Natera was researching the claimed technology around 2006 and that the same Matched Filter method described in the '544 Patent worked when applied to organ transplant in experiments he conducted in this case (D.I. 466, 214:22-23, 368:3-14).

Ignoring this adequate and substantial evidence, CareDx criticizes a purported lack of examples in the written description. Br., 9-11. But the Federal Circuit has held "that the written description requirement *does not demand either examples or an actual reduction to practice*." *Ariad Pharms. v. Eli Lilly & Co.*,

4

598 F.3d 1336, 1352 (Fed. Cir. 2010) (citation omitted). As summarized above, there was ample evidence for the jury to find possession.

Unable to credibly argue that examples are required, CareDx attempts to graft the same requirement using different language, relying on *Novozymes* for the proposition that an invention must be "described as an integrated whole." Br., 2-6. But *Novozymes* does not stand for the proposition that an invention must be described *in haec verba,* or as a single example. That is not the law. *See ScriptPro LLC v. Innovation Associates, Inc.,* 833 F.3d 1336, 1341 (Fed. Cir. 2016) ("a specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes"); *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014) ("written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described; it is not about whether the patentee has proven to the skilled reader that the invention works, or how to make it work, which is an enablement issue"); *see also Board of Trustees of Leland Stanford Junior Uni. v. Chinese Uni. of Hong Kong,* 860 F.3d 1367, 1375 (Fed. Cir. 2017) ("Substantial evidence supports a finding that the specification satisfies the written description requirement when 'the essence of the original disclosure' conveys the necessary

information—'regardless of how it' conveys such information, and even when the disclosure's 'words [a]re open to different interpretation[s].'").

*Novozymes* dealt with claims to particular enzyme variants with mutations at specific amino acid positions, not a method having distinct steps. 723 F.3d at 1388. In *Novozymes*, the specification provided broad generic disclosures of numerous possible amino acid positions at which mutations might be made. *Id*. *Novozymes* is inapposite because in that case both parties' experts *agreed* at trial that nothing in the written description would teach a POSA which enzymatic variants could achieve a claimed property that only further experiments could teach. *Id*. at 1350. Given this agreement between the experts, the Federal Circuit affirmed JMOL of invalidity for lack of written description because the specification disclosed neither "any variant that actually satisfie[d] the claims" nor "anything to suggest that Novozymes actually possessed such a variant at the time of filing." *Id*. at 1348; *see also Flash-Control v. Intel Corp.*, 2020-2141, 2021 WL 2944592 at *4 (Fed. Cir. July 14, 2021) (upholding JMOL because only support for claimed invention was two disparate figures and experts agreed combining them would be an "engineering feat.").

Here, the jury was not asked whether a broad genus of compositions was adequate description of a particular species. The jury heard competing expert testimony about the written description's scope and chose to credit Natera's

evidence over CareDx's.  Unlike *Novozymes*, where the experts agreed the specification lacked any disclosure that would lead a POSA to the species exhibiting the claimed technological improvement, here, Dr. Quackenbush showed the jury how, from the '544 Patent's disclosure, a POSA would conclude Natera possessed the entire claimed method.  D.I. 468, 984:25-988:15; D.I. 469, 1089:2-1095:21.  Dr. Quackenbush was not merely "pluck[ing] selectively" from the written description.  Br., 9.  He provided concrete examples showing the written description fully supports the claims.  D.I. 468, 984:25-988:15; D.I. 469, 1089:2-1095:21.

CareDx's other cited case, *Flash Control* (Br., 4), is also inapposite because in that case the patentee's expert admitted it would be a "feat" for a POSA to review the patent disclosure and understand that the inventor possessed the claimed material.  Here, Dr. Quackenbush explained how a POSA could understand from the patent's disclosure that Natera invented the claimed method.  *See* §IV.A.2 *infra*.  He testified to the jury that "if you actually read it and understand what [the '544 specification is] telling you … then you understand that this entire whole of Claim 21 is disclosed."  D.I. 469, 1095:17-21.

Dr. Quackenbush also identified the "Matched Filter" approach, an analytical method disclosed in the written description that "look[s] at small signals -- the donor signal or the fetal signal -- in the background of the mother or the

transplant recipient." *Id*., 1094:15-24. He showed the jury working examples in the written description that apply it. *Id*., 1094:25-1095:4. Dr. Rabinowitz testified that Matched Filtering could be used on cfDNA to yield accurate results in a transplant setting where the individuals are unrelated. D.I. 466, 214:22-23, 368:3-14.

In addition, the jury could have reasonably concluded that Dr. Quackenbush's testimony that a POSA could "look at puzzle pieces and figure out how they fit together" (Br., 4) referred to how the written description came together to disclose the claimed method. D.I. 469, 1094:8-1095:4, 1095:17-21. The fact-finder weighed Dr. Quackenbush's testimony alongside the other evidence and found that CareDx failed to meet its evidentiary burden. When awarding Natera "the benefit of all logical inferences that could be drawn from the evidence presented," the jury's verdict is plainly rational. *Williamson*, 926 F.2d at 1348.

### 2.    Natera Presented Sufficient Evidence That The '544 Patent's Written Description Supports Specific Claim Elements

CareDx insists the '544 Patent lacks disclosures showing Natera possessed certain elements of the claimed method. Br., 2-12. That also is not supported by the trial record.

***First***, Natera presented substantial evidence that the '544 Patent supports "sequencing-by-synthesis." Br., 6-9. The '544 Patent states sequencing-by-

synthesis can "be used for genotyping and SNP analysis." PTX-003 at 8:44-45.

Dr. Quackenbush explained that under the proper claim construction[2], and applying

a POSA's knowledge, sequencing-by-synthesis is evident in the '544 Patent. D.I.

468, 985:3-987:6. Dr. Quackenbush showed the jury that the '544 Patent explicitly

discloses sequencing-by-synthesis not only by pyrosequencing, but also using

"mini-sequencing," and that both are sequencing-by-synthesis under the Court's

claim construction. D.I. 468, 984:25-986:12. Dr. Rabinowitz, an inventor,

explained that Natera "had a set of techniques that involved amplifying the DNA at

SNP loci" that would "be very well suited" to sequencing-by-synthesis, as

reflected in the '544 Patent. D.I. 467, 375:15-376:2.

CareDx argues that Dr. Quackenbush's testimony on the challenges of

sequencing cfDNA by synthesis ***prior to the '544 Patent's inventions*** undermines

the jury's verdict. Br., 8-9. D.I. 469. But Natera presented evidence showing that

even if sequencing-by-synthesis of cfDNA was challenging and nonconventional

in 2006, a POSA would understand from the disclosure in the written description,

including the Matched Filtering techniques, that the inventors demonstrated

possession of sequencing-by-synthesis that could be used as part of the methods

claimed. D.I. 466, 207:11-208:20 (describing '544 Patent and Matched Filtering);

---

[2]    The Court previously found that the proper construction of "sequencing-by-synthesis" was not limited to "pyrosequencing," as CareDx advocated, but included all forms of sequencing-by-synthesis under its plain and ordinary meaning. D.I. 94.

214:2-215:9 (showing Matched Filtering disclosure in '544 Patent and how he applied the method to transplant samples processed using sequencing-by-synthesis); D.I. 467, 317:18-318:8 (describing importance of Matched Filtering and application to transplant samples processed using sequencing-by-synthesis); D.I. 468, 948:19-949:11 (admitting that '544 Patent contains "nine columns" of disclosure on Matched Filtering); D.I. 469, 1089:9-1091:2 (explaining how patent discloses analysis via Matched Filtering of mixed samples processed using sequencing-by-synthesis); 1094:3-1095:4 (same); PTX-003, 54:36-65:38.  As the Court acknowledged, disclosure of sequencing-by-synthesis is "a factual question that we need to have [the] jury's input" on.  D.I. 467, 348:18-19.[3]

**Second**, CareDx contends that the '544 Patent is limited to a "Parental Support" statistical method, which CareDx argues requires knowledge of the genetic information from a related individual.  But Drs. Quackenbush and Rabinowitz presented evidence that the '544 Patent discloses methods that do not require genetic information about a related individual.  D.I. 466, 207:21-208:1; D.I. 469, 1094:3-1095:4; PTX-003, 54:36-65:38.  Dr. Quackenbush explained that

---

[3]   CareDx's contention that the '544 Patent teaches away from using sequencing-by-synthesis (Br., 6-7) is based purely on attorney argument.  The jury was free to accept Dr. Quackenbush's explanation that a POSA would understand the patent to show the inventors had possession of using sequencing-by-synthesis, and to disregard CareDx's contrary expert testimony about purported teaching away. D.I. 468, 985:6-987:6.

the '544 Patent discloses the "matched filter approach" which "detects signal from noise" and "doesn't require parental data" to "look[] at small signals – the donor signal or the fetal signal – in the background of the mother or the transplant recipient." D.I. 469, 1094:15-24; *see also* D.I. 466, 207:21-208:1 ("The other category is where you don't need the parents' data. And that's a category of what we call 'matched filtering,' where you don't need to have the parents' data."). Dr. Van Ness admitted that "[t]here are other algorithms and analytical approaches that are described in the '544 besides and beyond parental support." D.I. 468, 947:21-24.

*Third*, Natera provided sufficient evidence that the '544 Patent discloses "mixed samples," e.g., containing genetic material from more than one individual. Dr. Quackenbush testified about multiple places in the specification where mixed samples are discussed. D.I. 469, 1089:2-1093:24 (Method 1(a) "disclos[es] that mixed analysis, taking it down to the point of looking at the allele frequencies."). Dr. Rabinowitz testified that Natera's core technology applies broadly to mixed samples (D.I. 467, 198:10-199:13), and that Matched Filtering applies to analysis of mixed samples. *Id*., 201:7-17, 214:18-20, 319:24-321:6. Dr. Van Ness admitted the '544 Patent discloses "mixed samples." D.I. 468, 914:20-915:18, 950:1-23. The jury was free to credit the copious evidence establishing that the '544 Patent discloses analysis of mixed samples.

CareDx's contention that there are no working examples of mixed cell-free DNA in the written description misses the mark.  Br., 11.  Setting aside the fact that the Matched Filtering example does test mixed samples and is applicable to cell-free DNA (D.I. 469, 1090:12-1091:3, 1105:17-1106:10), working examples are not a legal requirement for written description.  *Ariad*, 598 F.3d at 1352.  Instead,  "the description must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'"  *Id*. at 1351 (citation omitted).  The jury reasonably found that standard was met here.

**Finally**, Natera presented the jury with more than adequate evidence that the '544 Patent's written description supports a method involving cfDNA applicable to organ transplant.  Dr. Van Ness admitted that the '544 Patent discloses cfDNA.  D.I. 468, 913:16-18.  Dr. Rabinowitz testified that Natera began researching cfDNA "around 2005," then, during discovery, applied the Matched Filtering technique  to transplant samples, which yielded successful results.  D.I. 466, 214:22-23; *see, e.g., MorphoSys AG v. Janssen Biotech, Inc*., 358 F. Supp. 3d 354, 365 (D. Del. 2019) (recognizing that in written description analysis, "post-priority-date evidence can be considered where, as here, it is used to evaluate whether the disclosed species sufficiently represent the claimed genera.").  Dr. Rabinowitz also explained how the '544 Patent's disclosure regarding a species of mixed sample "relate[s] to organ transplant," because "when you are preparing that mixture of

DNA from a donor and an organ recipient, that is exactly the situation that is described by these claims."  D.I. 467, 368:3-14.

The jury was free to credit Natera's evidence, despite CareDx's proposition that the jury was required to take testimony from Dr. Zimmermann, another Natera scientist who is not named as an inventor on the '544 Patent, out of context.  *See* Br., 12; PTX-003.1.  Dr. Zimmermann testified not about whether the patent described the claimed methods, but rather about the commercialization of a transplant product.[4]  In fact, Dr. Zimmermann explained that Natera applied "our technology that **we had developed beforehand**" to transplant samples in 2018.  D.I. 468, 723:2-724:4.

The jury's written description verdict was also reasonable because Natera presented evidence of the similarities between the NIPT and transplant applications of Natera's technology.  CareDx does not dispute that Natera possessed a method capable of analyzing fetal samples.  Br., 10.  The jury heard testimony and saw documents demonstrating that Natera's organ transplant test "leverages the same workflow" as the NIPT test.  *See* D.I. 468, 1092:18-1093:4 (quoting PTX-0415); D.I. 467, 577:11-23 (explaining that Prospera was "buil[t] off the work we did with Panorama" so "it took a month to get a [transplant] proof of concept going."); *see*

---

[4]  CareDx also included irrelevant deposition testimony from several non-inventors on the asserted claims, which has no bearing on whether the written description provides adequate disclosure to a POSA.  *See* D.I. 468 at 983:14-984:13.

*also MorphoSys*, 358 F.Supp. 3d at 367.  Dr. Quackenbush pointed to these similarities to support his conclusion regarding the claimed genus of mixed samples, testifying that "the '544 patent show[s] possession for written description of mixed samples which would include transplant."  *See* D.I. 469, 1093:19-24, 1164:14-25 ("The laboratory test is the same for fetal or transplant.") (citing PTX-0124).  The jury reasonably concluded the same based on Natera's evidence.

CareDx also claims the '544 Patent written description only discloses a method that involves "isolating" fetal cfDNA from the mother's cfDNA.  Br., 10-11.  The jury was not bound by Dr. Van Ness's testimony on this point because it was based on CareDx's claim construction, which was rejected.  D.I. 469, 1357:8-18.  Thus, CareDx's (in any case inaccurate) contention that Dr. Quackenbush failed to rebut this testimony is of no import.  Br., 11; D.I. 468, 911:11-912:16.

CareDx's cherry-picked evidence regarding what the jury heard about the '544 Patent's disclosure of individual claim elements improperly "substitut[es] [its] own version of the facts for that of the jury," and its arguments based upon it should be rejected.  *Marra*, 497 F.3d at 300.

### 3.   The Jury Heard Ample Evidence That The Asserted Claims Of The '180 Patent Are Not Invalid Under Section 112

Natera provided testimony about specific portions of the written description that support the '180 Patent claim 14 and 15 elements, providing more than

sufficient evidence to support the verdict.  The jury, once again, was free to credit Natera's evidence over CareDx's; its verdict should stand.

**First**, Dr. Van Ness opined there was no support for "[m]ethods that do not involve primer selection to avoid primer side products."  Br., 14-16.  But Dr. Quackenbush pointed to numerous other PCR-related issues the '180 Patent addresses, including "allelic bias," "jackpotting," and "bottlenecking," as well as the use of "extension time and temperature" to "try to avoid different sources of noise."  D.I. 469, 1155:24-1158:13; *see also* D.I. 467, 560:15-561:16 (identifying primer dimers as "one of the big problems to overcome," but noting there "were many" others); D.I. 468, 719:4-16 (explaining that "removing primer dimer products was *one of the things* [Natera] worked on" in 2010); PTX-005, 4:67-5:67.

**Second**, as to CareDx's argument that there is no written description support for "[m]ethods where the genetically distinct individual is not a fetus," Br., 13-14, Dr. Quackenbush described "mixed samples" that are "references to transplantation," and explained that the patent acknowledges its methods can be applied "in lots of different ways with mixed samples."  D.I. 469, 1158:14-23; PTX-003, 54:36-70:60; D.I. 467, 368:3-14 (explaining that "mixed samples" include transplant samples).

15

***Third***, the jury was shown specific portions of the patent that disclosed "[a]mplifying SNP loci on chromosomes 1, 2, or 3." Br., 13-14; D.I. 469, 1158:24-1159:8; *see also* D.I. 468, 945:20-947:6 (Van Ness admitting that chromosomes 1, 2, and 3 are referenced several times in the written description). The jury also heard why these chromosomes are high-quality targets for Natera's diagnostic methods, including transplant. D.I. 467, 563:22-3 (testifying that chromosomes 1, 2, and 3 are "the larger chromosomes" and "tend to be stable"); D.I. 468, 722:15-22 (explaining chromosomes 1, 2, and 3 "have more" SNPs because they are larger).

***Finally***, Dr. Quackenbush explained how the claims are integrated as a whole because the written description, when read in its entirety, sets forth the basis for a POSA to understand what the claimed invention is. D.I. 469, 1163:5-1164:5.

CareDx's reliance on *Ariad*, (Br., 13), is misplaced because the written description at issue in *Ariad* lacked any "working or even prophetic examples of methods that reduce [the claimed] activity, and no completed syntheses of any of the molecules prophesized to be capable of reducing [the claimed] activity." 598 F.3d at 1356-58. As such, the *Ariad* court found the claims invalid, stating "a vague functional description and an invitation for further research does not constitute written disclosure of [the claimed] invention." *Id*. at 1356.

16

That is not the case here.  The written description of the '180 Patent does not contain "vague functional description[s]," "an invitation for further research," or "a wish, or arguably a plan" for further research.  Instead, the written description contains concrete disclosures that, as Natera's evidence showed, a POSA would be able to—and did—read and understand as disclosing the claimed invention.  The jury's choice to credit Natera's substantial evidence, and its verdict that CareDx failed to prove lack of written description by clear and convincing evidence, should not be disturbed.

## B.    The '180 Patent Is Patent-Eligible Under Section 101

CareDx asks the Court to ignore the jury's factual finding that the claims of the '180 patent are non-conventional.  D.I. 460, 9-11. Worse, CareDx cannot prove that the '180 Patent claims are legally directed to a natural phenomenon under *Alice/Mayo*.  Ignoring the substantial evidence considered by the jury, CareDx resorts to the same arguments the Court rejected on summary judgment, comparing the Natera claims to claims invalidated in *Diagnostics, Inc. v. Sequenom, Inc*.  Br., 17; *see* 788 F.3d 1371, 1373 (Fed. Cir. 2015).  CareDx supports those arguments only with reference to disputed evidence in the trial record, which the jury discredited, and which cannot support CareDx's JMOL request.  Br., 17.

At the *Alice* Step One inquiry, CareDx's comparison to the *Ariosa* claims only highlights the technological improvements claimed in the '180 Patent.  The

entirety of claim 1 of the *Ariosa* patent[5] entailed "amplifying a paternally inherited nucleic acid from the serum or plasma sample and detecting the presence of a paternally inherited nucleic acid of fetal origin in the sample."  Contrast that with '180 Patent claim 14, which recites that amplification is performed "for more than 100 SNP loci," and "in a single reaction mixture using more than 100 PCR primer pairs" in a manner suitable for "high-throughput sequencing" and "measuring" donor fraction "without prior knowledge of" the donor's genotypes.

Amplifying multiple targets simultaneously in one reaction mixture is advantageous in a method that requires processing, sequencing, and analyzing hundreds or thousands of SNPs, and there was ample evidence adduced at trial to prove this claimed combination was a non-conventional improvement over prior art methods, not just a natural phenomenon.  *See* D.I. 327 at 16-17; D.I. 469, 1159:24-1162:23, 586:17-589:6.

Natera presented voluminous evidence showing the '180 Patent recites improvements to laboratory techniques for measuring specific types of DNA, and the claims are directed to the recited combinations constituting those improvements.  Dr. Quackenbush testified that the claimed methods of the '180 Patent "absolutely were not routine and conventional" and described how the limitations were not well-known in the context of the claims, or even capable of

---

[5]  U.S. 6,258,540.

being performed in the claimed combination.  D.I. 469, 1159:14-1162:23.  Far

from "routine and conventional," Dr. Gemelos testified that Natera was "singly

focused" as a company for "years" on successfully combining next-generation

sequencing with multiplex PCR (as claimed in the '180 Patent), including "a lot of

late nights and weekends," overcoming "one challenge after another."  D.I. 467,

586:17-589:6.  Based on this evidence, the jury was free to side with Natera

notwithstanding Dr. Van Ness's testimony that "targeted PCR" and "high-

throughput sequencing" were routine and conventional (D.I. 469, 893:8-895:18),

and to find that the claimed methods of the '180 Patent were not routine and

conventional.  *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050

(Fed. Cir. 2016) ("This new and improved technique, for producing a tangible and

useful result, falls squarely outside those categories of inventions that are 'directed

to' patent-ineligible concepts.").

    For the same reasons, it is of no moment whether the '180 Patent recites

"methods of detection," as CareDx argues.  Br., 17.  Dr. Quackenbush provided

substantial testimony, which the jury credited, to show the claims are directed to

patent-eligible *improvements* over prior art methods.  *CellzDirect*, 827 F.3d at

1050; D.I. 469, 1159:24-1162:23.  CareDx cannot meet its burden of showing the

'180 Patent claims are conventional by clear and convincing evidence, and the

jury's factual findings and verdict, based on substantial evidence as cited above, should stand.

### C. Damages

#### 1. Foreign Damages

Regarding AlloSeq, the jury was instructed to award damages for sales of products found to "practice the patented methods in the United States." D.I. 458 at 4. The jury found AlloSeq practiced the claims in the United States. D.I. 460; *see also* D.I. 426-1 (CareDx conceding it "performed all steps of the accused AlloSeq test in the United States"). Accordingly, to value that infringement, the jury was permitted to consider foreign sales of AlloSeq. *Carnegie Mellon Uni. v. Marvell Tech. Grp.*, 807 F.3d 1283, 1310 (Fed. Cir. 2015) (jury may consider "sales that resulted from [domestic] infringing use in order to value that use."). The jury's award was in line with evidence connecting AlloSeq foreign sales to CareDx's domestic infringement. *See* D.I. 467, 383:22-384:11.

#### 2. Lost Profits

The jury's $83,679,521 lost-profit award was amply supported by evidence. Natera proved up each *Panduit* factor. *See* D.I. 458 (*Panduit* Jury Instructions) at 6; D.I. 470, 1493:11-24, 1573:12-18 (factor 1: demand), 1493:25-1498:6 (factor 2: evidence that other cfDNA tests are the only acceptable non-infringing substitutes), 1498:7-1499:15, 1580:4-9 (factor 3: capacity to exploit demand), 1500:4-1502:12 (factor 4: amount of profit).

Natera also presented a wealth of evidence, including CareDx admissions, showing a "reasonable probability" that but-for the infringement, Natera would have made a portion of CareDx's infringing sales.  Natera showed that the relevant market is cfDNA testing because cfDNA tests offer advantages that are important to customers but not provided by non-cfDNA tests.  *See*, *e.g.*, D.I. 470, 1495:11-1496:10 (PTX-279, detailing advantages of cfDNA testing over "less accurate" DSA and "invasive" biopsy); 1496:15-1497:6 (PTX-456, CareDx brochure describing drawbacks of biopsy); 1497:8-1498.4 (CareDx describing advantages of cfDNA tests over biopsy and creatinine); 1576:2-1577:20 (admissions from CareDx expert).  Natera showed in the cfDNA testing market, there are three competitors (CareDx, Natera, Eurofins), and explained how Natera and Eurofins would capture CareDx's market share in the but-for world.  D.I. 470, 1489:19-1491:25, 1500:17-1501:11.

In light of that evidence, the jury was free to conclude that physicians in the but-for world would replace AlloSure with cfDNA tests from Natera and Eurofins.  *See* D.I. 458, 15 (instructing jury to consider whether the alleged non-infringing alternative "had the same advantages as the patented invention that were important to people"); *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1162 (6th Cir. 1978) ("A product lacking the advantages of that patented can hardly be

termed a substitute 'acceptable' to the customer who wants those advantages."); D.I. 470, 1574:20-1575:4.

CareDx challenges the lost profits damages award on grounds that a fact witness (Prewett) refused to speculate about the but-for world (Br., 20), that there was conflicting evidence about the reliability of Natera's clinical data (Br., 20-21), and by reiterating its losing *Daubert* argument that the universe of non-infringing alternatives must include non-cfDNA testing methods, such as biopsy (Br., 21). *See also* D.I. 467, 661:3-4 (ruling that what constitutes an acceptable non-infringing alternative is "a jury question"). This evidence shows, at ***most***, that the jury ***could have*** found that Natera was not entitled to lost profits. But on JMOL the test is whether the evidence permitted the jury to find lost profits, which it did. Separately, CareDx argues that Natera's expert Mr. Gunderson did not account for CareDx's costs (claimed at $100 million) to "create the market" for cfDNA testing. Br., 21. These costs are irrelevant to the lost profits analysis because CareDx incurred these costs ***before*** the onset of the but-for world, as CareDx's expert conceded. D.I. 470, 1581:13-1582:2.

### 3. Remittitur

Remittitur is unwarranted because, as shown above, the jury's damages award was not excessive. The $83 million lost profits award is reasonable in light of evidence that CareDx competes directly with Natera and made $350 million in

infringing sales during the damages period (D.I. 470, 1572:22-1573:6), and that Natera would have made 154,000 additional sales at 56.84% profit margin in the but-for world (D.I. 470, 1501:4-1502:12).  CareDx did not challenge the jury's reasonable royalty damages for AlloSure.

## IV.    CONCLUSION

Natera requests that the Court deny CareDx's motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*

_____
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA  94065
(650) 801-5000

Andrew M. Holmes
Jeff Nardinelli
Jocelyn Ma
Andrew E. Naravage
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600

Sandra L. Haberny, Ph.D.
Sarah M. Cork, Ph.D.
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

May 31, 2024

*Attorneys for Plaintiff Natera, Inc.*

Bianca Fox
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

Abigail E. Clark
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
2601 South Bayshore Dr, Suite 1550
Miami, FL 33133
(305) 402-4880

## **WORD COUNT CERTIFICATION**

The undersigned counsel hereby certifies that the foregoing document contains 4,986 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font.  The word count includes only the body of the brief.  The word count does not include the cover page, tables of contents and authorities, or the counsel blocks.

*/s/ Derek J. Fahnestock*

_____

Derek J. Fahnestock (#4705)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 31, 2024, upon the following in the manner indicated:

Brian E. Farnan, Esquire                         *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

Edward R. Reines, Esquire                        *VIA ELECTRONIC MAIL*
Derek C. Walter, Esquire
Shawn Chi, Esquire
Nate Ngerebara, Esquire
August Melcher, Esquire
Concord Cheung, Esquire
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
*Attorneys for Defendant*

Randi W. Singer, Esquire                         *VIA ELECTRONIC MAIL*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
*Attorneys for Defendant*

W. Sutton Ansley, Esquire                          *VIA ELECTRONIC MAIL*
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC  20036
*Attorneys for Defendant*


                                    */s/ Derek J. Fahnestock*

                                    _____
                                    Derek J. Fahnestock (#4705)