IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATERA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 20-038 (CFC) (CJB) |
| | ) | (CONSOLIDATED) |
| v. | ) | |
| | ) | REDACTED - PUBLIC VERSION |
| CAREDX, INC., | ) | Original filing date: October 21, 2024 |
| | ) | Redacted filing date: November 4, 2024 |
| Defendant. | ) | |

## NATERA, INC. ANSWERING BRIEF IN OPPOSITION TO MOTION TO REOPEN THE RECORD

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

*Attorneys for Plaintiff Natera, Inc.*

Andrew M. Holmes
Jeff Nardinelli
Jocelyn Ma
Andrew E. Naravage
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600

Sandra L. Haberny, Ph.D.
Sarah M. Cork, Ph.D.
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

Bianca Fox
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

Abigail E. Clark
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
2601 South Bayshore Dr, Suite 1550
Miami, FL 33133
(305) 402-4880

October 21, 2024

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................3

II.     LEGAL STANDARDS ..........................................................................4

III.    ARGUMENT..........................................................................................5

      A.    Dr. Quackenbush Testified That Claim 21 Requires
              Computation; CareDx's Contrary Arguments Have No
              Probative Value ...........................................................................5

            1.    Dr. Quackenbush Consistently Testified That Claim
                    21(c) Uses Information Generated By Mathematical
                    Computation, Combining It With Other Information In
                    "Determining" ...............................................................6

            2.    Dr. Quackenbush's Post-Trial Testimony Is Consistent
                    With, And Cumulative Of, His Trial Testimony ......................13

      B.    The Testimony CareDx Seeks To Introduce Is Irrelevant To
              Section 101 ..................................................................................14

            1.    Claim 21 Recites A Patentable Method Of Preparation
                    (Valid At Step One), And The Jury Found All Of Its
                    Steps Non-Conventional (Valid At Step Two)........................15

            2.    Dr. Quackenbush's Testimony Does Not Establish The
                    Claims Are Directed To An Abstract Mental Process..............16

            3.    The Printed Matter Doctrine Is Irrelevant................................18

            4.    CareDx Is Seeking An Improper And Belated Claim
                    Construction ...............................................................20

      C.    Reopening The Record Would Prejudice Natera...............................20

      D.    Reopening The Record Would Be Burdensome And Waste The
              Court's Time..................................................................................22

IV.     CONCLUSION....................................................................................24

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010) .........................................................................17

*C R Bard Inc. v. AngioDynamics, Inc.*,
  979 F.3d 1372 (Fed. Cir. 2020) .........................................................................18

*In re Chemed Corp., S'holder Derivative Litig.*,
  No. 13-1854-LPS-CJB, 2017 WL 1712530 (D. Del. Apr. 25, 2017).................21

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat.
  Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) .........................................................................16

*Enzo Biochem, Inc. v. Calgene, Inc.*,
  188 F.3d 1362 (Fed. Cir. 1999) .........................................................................11

*Ioengine, LLC v. Ingenico, Inc.*,
  100 F.4th 1395 (Fed. Cir. 2024) .........................................................................16

*Joy Tech., Inc. v. Flakt, Inc.*,
  901 F.Supp. 180 (D. Del. 1995)...........................................................................2

*Paige v. Holt*,
  439 Fed.Appx. 169 (3d Cir. 2011).........................................................................2

*PersonalWeb Techs. LLC v. Google LLC*,
  8 F.4th 1310 (Fed. Cir. 2021) ...............................................................14, 15, 16

*Praxair Distribution, Inc. v. Mallinckrodt Hospital Products IP Ltd.*,
  890 F.3d 1024 (Fed. Cir. 2018) .........................................................................18

## Other Authorities

M.P.E.P. § 2111.05 ..................................................................................................17

## I.    INTRODUCTION

CareDx's motion to reopen (D.I. 538, "Br.") seeks to introduce selective and misinterpreted post-trial testimony from Dr. Quackenbush as a re-do of its pending motion to invalidate the claims of U.S. Patent No. 11,111,544 ("'544 Patent") under 35 U.S.C. § 101 (D.I. 488).  CareDx argues that this new testimony shows the '544 Patent claims do not require any math, and thus they purportedly are directed to an abstract mental process. But the arguments in CareDx's motion to reopen are factually baseless, contradict CareDx's prior positions over years of litigation and trial, ███████████████████████████████████████████████

████████████████████████████████████████████████

████████    CareDx's about-face now is just an attempt to maximize a return on invalidity under the belief it is immunized from infringement liability because Natera withdrew its ongoing infringement claims.  Injecting this theory into a reopened record would be highly prejudicial to Natera.

Dr. Quackenbush's testimony is consistent with, and cumulative of, what he said at trial—that the claims do require a mathematical process and the math improves upon the recited laboratory techniques.  Even if the Court were to favor CareDx's cherry-picked quotes and new, expansive interpretation that the claims do not require math, the claims nevertheless remain patentable under Section 101 as directed to methods of preparation at Step One (as the Court recognized before trial)

and non-conventional at Step Two on multiple limitations individually and in combination (as the jury recognized at trial).

There is no basis for the extraordinary relief CareDx seeks in reopening the record to include this irrelevant testimony or CareDx's new arguments based upon it. The motion should be denied.

## II.     LEGAL STANDARDS

"Relief in the form of reopening the judgment is available only when the case presents extraordinary circumstances." *Paige v. Holt*, 439 Fed.Appx. 169, 171 (3d Cir. 2011). "[T]he trial court should consider: 1) the timing of the motion and the moving party's explanation for failing to introduce the evidence earlier, 2) whether the evidence sought to be introduced is especially important or probative and 3) whether reopening will cause undue prejudice to the nonmoving party." *Joy Tech., Inc. v. Flakt, Inc.*, 901 F.Supp. 180, 181 (D. Del. 1995). "The Third Circuit has described two scenarios where new evidence has sufficient probative value to justify reopening a trial" including (1) "to allow [a party] to supply certain defects and omissions in his proof" and (2) "when the failure to provide important evidence is due to a reasonable misunderstanding among the parties and the trial court." *Id.*

## III.  ARGUMENT

### A.  Dr. Quackenbush Testified That Claim 21 Requires Computation; CareDx's Contrary Arguments Have No Probative Value

CareDx misconstrues Dr. Quackenbush's post-trial deposition testimony regarding whether "RFS-AlloSure" infringes by practicing Claim 21(c)—"determining the most likely data for DNA from the first individual based on allele frequencies…."  CareDx selectively excerpted (at 11-12) Dr. Quackenbush's testimony to support its specious new contentions that (1) the "determining" step of Claim 21 does not require mathematical computation, and (2) Dr. Quackenbush contradicted his earlier trial testimony.  Dr. Quackenbush's post-trial testimony, which concerned infringement by CareDx's RFS-AlloSure ██████████████ ██████████████████████, supports neither of CareDx's assertions.

 CareDx ignores both the substance and context of Dr. Quackenbush's full answers and deposition as a whole, during which Dr. Quackenbush explained that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████

CareDx further ignores Dr. Quackenbush's testimony that the ultimate "determination" involves combining different pieces of information, and "[r]eporting that particular most likely genetic data ***does require some calculations***"

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

CareDx also ignores Dr. Quackenbush's clarification that no "*particular*" math or computation is required by the claims. Saying that no "particular" computation is required is different than saying no computation is required at all. This is consistent with Dr. Quackenbush's unequivocal testimony that some mathematical computation is required for satisfying the "most likely genetic data" and "based on allele frequencies" elements of the final step of Claim 21. Indeed, each of these elements serves as a necessary input for the final "determination," a fact that Dr. Quackenbush's full testimony makes clear.

### 1. Dr. Quackenbush Consistently Testified That Claim 21(c) Uses Information Generated By Mathematical Computation, Combining It With Other Information In "Determining"

As explained below, during the post-trial phase, Dr. Quackenbush consistently testified that RFS-AlloSure ████████████ ██ ██ ██ ██ ████████—an estimate for percent dd-cfDNA and that these results are used alongside patient information to make a determination. CareDx's assertion (at 10) that "Dr. Quackenbush changed his tune regarding the meaning of '544 Patent's 'determining' step" is incorrect.

---

[1] Emphasis added herein unless otherwise noted.

CareDx claims (at 11) that Dr. Quackenbush "testif[ied] repeatedly that [the 'determining' step] involves only accessing and reporting information—not the algorithms, calculations, computations, and estimates he discussed at trial." However, Dr. Quackenbush explained in detail that Claim 21(c)—which is not solely "determining," but "determining the most likely genetic data for DNA from the first individual based on allele frequencies"—definitively involves mathematical computations. CareDx leaves the full testimony out of its brief; Natera reproduces it more fully below.

Dr. Quackenbush explained, in opining on infringement, that "th[e] CareDx products report back a percentage of donor-derived cell-free DNA. . . . Reporting that particular most likely generic data *does require some calculations*." Ex. 1 at 418:9-419:2. He explained that in bringing everything together in the "determining" part of the step, a CareDx scientist ███████████████████████████████ ████████████████████████████████████████ █████████ ██ ██████████████████████████ Dr. Quackenbush explains that calculations are necessary for the "determining" step. He provides no opinion that "determining" is possible without computational results █████████████████

Dr. Quackenbush further testified how a person of skill in the art would interpret the language of the claim with respect to infringement:

The *claim requires determination based on allele frequencies, and* ████████████████████████████████████████, and when all of that data and information is brought together by the clinical laboratory scientist and a determination is made to generate a report, the determination is clearly based on the sequencing data, which delivers the allele frequencies.

Ex. 1 at 407:17-408:3. Dr. Quackenbush's testimony confirms that mathematical computation based on allele frequencies—████████████████████████████ ██████—is *required* to make a determination consistent with Claim 21:

- "All I can tell us is that the CareDx process ████████████████████ ████████████████████████████████ that CareDx characterizes as an estimate or a guess, and that the final determination is based on allele frequencies." *Id.* at 409:13-19.

- "But I can tell you that when the clinical laboratory scientist sits in Brisbane, California, *accesses and retrieves the data*, merges it together, so that the estimates can turn into a determination of the most likely genetic data for DNA from the first individual, *that that is based on allele frequencies, because allele frequencies are part of whatever process is used to arrive at the numbers that go into the determination*." *Id.* at 416:4-14.

This is consistent with the testimony of inventor Dr. Rabinowitz at trial regarding how the patent claims work. D.I. 467 at 317:16-318:8.

Dr. Quackenbush further explained post-trial that because the "determination" is of "the most likely genetic data for DNA from the first individual," infringement requires mathematical computation:

- "So as we discussed many times earlier, they are making a determination for the most likely DNA from the first individual, which based on the results of the trial and admissions by CareDx is the percent donor-derived DNA that is reported back to the patient and their ordering physician." *Id.* at 462:13-23.

- ███████████████████████████████████████
  ███████████████████████████████████████

Dr. Quackenbush never testified that "the claim does not 'require computation,' 'estimates,' or 'numbers on a computer' at all." Br. at 12. That is, ultimately, a legal question, and one that Natera had to assess before deciding not to proceed with the ongoing infringement claim. Dr. Quackenbush's testimony acknowledged that the results of mathematical computations were required in making RFS-AlloSure's final "determination" and that those computations were being performed.

Dr. Quackenbush testified that the claims do not require a "particular" computation—never that they require no computation:

> Q. Is there any *specific* math that is required by claim 21 to perform the determination of the most likely genetic data for DNA from the first individual based on allelic frequencies?
>
> A. So claim 21, and in particular claim 21c, which is what we are primarily discussing today, does not specify the use of *any particular* calculations. You know, one could potentially conceive of lots of different ways that determination might be made and what could be reported back as the most likely genetic data.

Ex. 1 at 417:20-418:8. He echoed this view consistently throughout his deposition:

- "The patent doesn't require any *particular* mathematical computation." *Id.* at 463:3-4.

9

- "[The clinical laboratory scientists] may do some mathematical calculations or estimations. I don't know all of the data that they look at in making their determination. They may look at things ***in addition to*** ███████████████████████" *Id.* at 464:8-15.

CareDx's selectively excerpted quotations, viewed in context, prove that Dr. Quackenbush never stated no math was involved in performing the claim as a whole—especially as it related to "genetic data" and "allele frequencies"—in practicing Claim 21:

| CareDx's Selective Excerpts at Br. 11-12[2] | What Dr. Quackenbush Said In Context |
|---|---|
| "Numbers on a computer … I don't believe represent the determination that we talked earlier about the meaning of determining." (394:12-15)<br><br>"[T]he final determination occurs at some point when th[e] percent of donor-derived cell-free DNA is included in the report that is provided back to the patient." (395:10-14) | These quotes are part of a single answer (393:16-395:24). CareDx focuses on Dr. Quackenbush addressing the "determining" sub-part of the claim without considering other testimony regarding the "based on allele frequencies" and "most likely genetic data," which Dr. Quackenbush testified involve math—specifically here the percentage of donor derived cell-free DNA. (407:4-408:3, 418:15-18). The very testimony on which CareDx relies explains that the results of the calculations must be included in the determination: "[T]he ***final determination occurs at some point when that percent of donor-derived cell-free DNA is included in the report*** . . . ." (395:10-14). |

_____

[2] Citations in this table are to Ex. 1.

| | |
|---|---|
| "Claim 21 doesn't require computation or any other particular analyses of data to be performed." (406:2-4)<br><br>"The claim doesn't require computation." (407:16-17) | CareDx's quotes are part of a single answer. Dr. Quackenbush's response was consistent with his other testimony that a **_particular_** calculation as not required. He goes on to say that "[t]he claim requires **_determination based on allele frequencies, and input to that determination are_** ▇▇▇▇▇▇▇ ▇▇▇▇ ▇▇ ▇▇▇▇ ▇▇▇▇▇ , and when all of that data and information is brought together by the clinical laboratory scientist and determination is made to generate a report, **_the determination is clearly based on the sequencing data, which delivers the allele frequencies_**." (407:16-408:3). |
| "The patent doesn't require any particular mathematical computation." (463:3-4)<br><br>"[T]he claim language does not require a mathematical computation." (463:12-14) | CareDx's quotes are part of consecutive answers. Dr. Quackenbush first was asked "When you say they make a determination, what are they doing that you are saying is the determination?" He testified that "[t]he patent doesn't require any **_particular_** mathematical computation." (463:3-4). The examining attorney then asked "I am asking what they did, **_not what the patent requires_**." (463:5-6). Dr Quackenbush stated that "the claim language"—referring specifically to the "determining" element—does not require a mathematical computation." (463:12-14). He then explained based on other claim elements that the determination requires "**_the percent of donor-derived DNA, the genetic data of DNA from the first individual_**[,]" which is a necessarily calculated from the sequencing data. (463:22-24). This |

| | |
|---|---|
| | is consistent with Dr. Quackenbush testifying the claim does not require a *particular* computation throughout his deposition. |
| "[C]laim 21 … does not specify the use of any particular calculations. You know, one could potentially conceive of lots of different ways that determination might be made and what could be reported back as the most likely genetic data." (418:1-8) | The quoted answer facially refers to "*particular* calculations." In an omitted portion of the answer, Dr. Quackenbush states that ***[r]eporting that particular most likely genetic data does require some calculations.*" (418:15-419:1). |
| "[T]here is no requirement of any particular calculation that is used." (414:6-7) | This quote again refers to *particular* calculations. Dr. Quackenbush confirmed in the same answer that the claimed "determination is based on *allele frequencies.*" (414:8-10). |
| ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ (453:5-11)<br><br>"[D]etermination … occurs when the clinical laboratory scientist … accesses and downloads or obtains the data [] and then makes the determination." (454:9-16)<br><br>███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ (459:6-10) | Dr. Quackenbush discussed the "determining" subpart of Claim 21(c). CareDx ignores his testimony (*see* above) stating the ███ ███ ███ █████████ ██████ practice other subparts of the claimed method regarding "allele frequencies" and "most likely genetic data," which are used in the ultimate performance of the determining step. (407:4-408:3, 418:15-419:2). |
| "The determination is what is reported back." (362:8-10) | CareDx omits the immediately preceding testimony stating: "The claim language says that: 'One must |



|  | determine the most likely genetic data for DNA from the first individual.' ████ ████████████████████ ██████████ (361:15-20). |

### 2. Dr. Quackenbush's Post-Trial Testimony Is Consistent With, And Cumulative Of, His Trial Testimony

Dr. Quackenbush testified post-trial that as part of the "determining" step, a scientist in CareDx's California laboratory accesses and retrieves the results from the calculations of the T1 and T2 processes and analyzes the results in order to ensure a proper determination is being reported to the patient. Ex. 1 at 359:16-364:18, 368:14-370:8, 440:6-442:20. This is consistent with what Dr. Quackenbush testified to at trial. D.I. 467 at 455:4-456:1, 457:16-25, 494:4-8 ("The data gets sent off to a computer, it counts up how many alleles are there, and then reports back to the user who interprets that measurement, which is at percentage of donor-derived cell-free DNA."). Dr. Quackenbush did not opine post-trial that in the claimed method, leading up to the final "determination," there is no math. The evidence that CareDx seeks to admit via its motion is not only non-probative, it is redundant and cumulative of Dr. Quackenbush's trial testimony.

In an analogous case, the Federal Circuit affirmed the district court's "discretion in declining to admit evidence that was essentially cumulative of that which the court had already considered." *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1380 (Fed. Cir. 1999). The same law should apply here. Dr.

13

Quackenbush's post-trial testimony, while addressing infringement by a new
product (RFS-AlloSure) was consistent with his trial testimony in explaining that
practicing Claim 21(c) involves mathematical computation.[3]   There is nothing
important or probative about Dr. Quackenbush's post-trial testimony that warrants
reopening the record.

> ### B.    The Testimony CareDx Seeks To Introduce Is Irrelevant To Section 101

None of CareDx's cherry-picked "evidence" bolsters its untenable Section
101 invalidity arguments—indeed, none of it is relevant because Claim 21 is directed
to a patentable method of preparation, of which the jury found all claim elements to
be non-conventional.  CareDx's multiple efforts to invalidate the '544 Patent under
Section 101—on summary judgment and at trial—have fallen short for good reason.
Further, CareDx's  attempt to prop up its third try post-trial with implausible "mental
process" and "printed matter" arguments based on disconnected testimony likewise
fails.

---

[3] Ex. 1 at 457:12-18 (answering question about pre-trial expert report, explaining
"the opinions I offer here [in pre-trial report] about what [] ▮▮▮▮▮▮▮ in providing
these estimates is completely consistent with the analysis that I performed in my
posttrial analysis – my posttrial declarations").

### 1.    Claim 21 Recites A Patentable Method Of Preparation (Valid At Step One), And The Jury Found All Of Its Steps Non-Conventional (Valid At Step Two)

This Court denied CareDx's motion for summary judgment regarding invalidity of the '544 Patent under Section 101, reasoning that because the claims recite methods of preparing a preparation, "under *Illumina*, [the claims of the '544 Patent] are not *per se* directed to ineligible patentable subject matter." D.I. 402 at 13. Nothing Dr. Quackenbush said post-trial touches on this fact, and CareDx ignores it in its motion.

Though a ruling that the claims do not fail at Step One is sufficient to end the inquiry, the Court further submitted factual questions to the jury, asking whether the claimed elements independently and in combination were routine and conventional under Step Two. The jury—based on evidence beyond just Dr. Quackenbush's testimony, including documents and the inventor testimony of Dr. Rabinowitz—returned a verdict finding that all elements, except the preamble, of Claim 21 are non-conventional both individually and in combination. D.I. 460 at 6-8.[4] Now CareDx erroneously proclaims to have a smoking gun in the form of Dr.

---

[4]    CareDx asserts (at 7, 13) Natera conceded the asserted claim steps are "conventional." Although Natera conceded one step—extraction of cfDNA—was conventional, it never conceded any other steps of the asserted claims are conventional. Throughout the entire case, Natera has steadfastly contended that the claims are ***not*** conventional. *See* D.I. 327 at Section II.B.; D.I. 469 at 1110:3-1115:5; D.I. 509. The jury agreed. D.I. 460 at 6-8.

15

Quackenbush's post-trial testimony that allegedly establishes the claims are directed to an unpatentable mental process or printed matter. Neither theory applies, and notably CareDx has never attempted to make its printed matter argument in any of the three Section 101 challenges it has cast so far in the case.[5]

### 2. Dr. Quackenbush's Testimony Does Not Establish The Claims Are Directed To An Abstract Mental Process

CareDx's "abstract mental process" argument is not only factually wrong for the reasons set forth in Section III.A.1 above, it is legally irrelevant to the reasoning the Court employed at Step One and the jury's factual non-conventionality findings at Step Two. CareDx tried and failed to clearly convince the jury otherwise. D.I. 460 at 6-8.

"Determining the most likely genetic data for DNA from the first individual based on allele frequencies" as claimed is more than looking at something, and it cannot be "performed in the human mind" or by "using a pencil and paper." *See PersonalWeb Techs. LLC v. Google LLC,* 8 F.4th 1310, 1317 (Fed. Cir. 2021). The claimed determination here requires analysis of laboratory-prepared samples pursuant to the claim steps and computational inputs such as those performed by ██ ████████████████████████████ for "determining" the most likely genetic data based on allele frequencies (e.g., percent dd-cfDNA determined in

---

[5] The Court should find CareDx waived its "printed matter" argument because it did not raise it in its post-trial Section 101 briefing. D.I. 488, 519.

AlloSure). The evidence at trial showed those computations use Natera's innovations employing allele data to improve the recited laboratory methods, and the jury found that none of the steps were routine or well-understood.

CareDx's reliance (at 16-17) on *PersonalWeb* is misplaced. In *PersonalWeb*, every step of the claims was directed to abstract elements and thus the claims failed at Step One, and all of the claim elements were deemed conventional at Step Two. 8 F.4th at 1317.

Here, unlike in *PersonalWeb* where an algorithm controlled access to unclaimed data items, retrieved and delivered copies of unclaimed data items, and marked copies of unclaimed data items for deletion (*id.* at 1316), Dr. Quackenbush testified that CareDx's scientists practice Claim 21(c) by (a) ███████████ ████████████████████████████████████████████████—*i.e.*, the claimed "most likely genetic data for DNA" that is "based on allele frequencies"—(b) combining the results of those claimed elements with the patient's personal data to de-anonymize the results, and (c) analyzing the combined results to make a determination as to the most likely genetic data, as claimed, "from the first individual," which can (but is not required by the claims to) then be reported to patients. Ex. 1 at 361:19-362:12.

Additionally, in *PersonalWeb* the court found only conventional components were used. *PersonalWeb*, 8 F.4th at 1318. Here, the jury found the claim elements individually and in combination to be non-conventional.

CareDx also mistakenly relies (at 17-18) on *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014). In *Content Extraction*, the patentee conceded that the core steps of character recognition and data extraction were well known and conventional. The Court found the overall method of "receiving," "recognizing," and "storing" data in the claimed manner was well-known and practiced prior to the filing date; the claims only applied these known methods in a computer-implemented format. None of these factors are relevant here—both the record evidence and jury findings support the non-conventional and inventive nature of the claims. *Id.* at 1348.

### 3. The Printed Matter Doctrine Is Irrelevant

CareDx further (at 15-18) twists Dr. Quackenbush's testimony to support its far-fetched printed matter argument. CareDx extends the printed matter doctrine to unprecedented lengths: every case CareDx cites for the printed matter doctrine invokes it only for prior art analysis—none of the cases suggest it is applicable to determinations of patent eligibility. Nor is it relevant here.

CareDx incorrectly relies (at 15-16) on *Ioengine, LLC v. Ingenico, Inc.*, 100 F.4th 1395, 1404 (Fed. Cir. 2024) to support its printed matter argument. There, the

court reversed the Board's finding that the claims to "encrypted communications" were directed to printed matter because "printed matter is matter that is claimed for its communicative content." *Id.* at 1404. The court instructed that "[t]he fact that there is a communication itself is not content … [p]rinted matter encompasses what is communicated [] rather than the act of a communication itself." *Id.*

Similarly here, Natera is not claiming the communicative content of the math limitations; rather, the '544 Patent claims the act of "***determining*** the most likely genetic data … based on allele frequencies." This is in the context of a method of preparing a sample that is useful for determining such results—and the claim expressly recites functional mathematical aspects of such calculations ("most likely genetic data . . . based on allele frequencies") rather than their communicative content. Dr. Quackenbush's testimony confirms that the mathematical limitations should be accorded patentable weight, even if they were deemed to be printed matter, because they are functionally tied to the claimed method. *See, e.g.,* M.P.E.P. § 2111.05. CareDx has made no showing otherwise.

CareDx's reliance (at 16) on *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1065 (Fed. Cir. 2010) also fails. There, the court found a claimed limitation of a "label" on a drug was not entitled patentable weight. *Id.* Here, "determining the most likely genetic data for DNA from the first individual based on allele frequencies" is an action not akin to the label in *AstraZeneca*.

19

### 4. CareDx Is Seeking An Improper And Belated Claim Construction

CareDx's argument amounts to little more than an untimely attempt to construe the claims to exclude mathematical computation and focus on printed matter that is not an element of the claims.[6] Even if it were possible to construe the claims now, ten months after trial, the construction CareDx favors finds no support in Dr. Quackenbush's post-trial testimony or the record. Of course, until Natera decided not to pursue infringement claims against CareDx's RFS-AlloSure, CareDx argued strenuously that the mathematical calculations make all the difference.

### C. Reopening The Record Would Prejudice Natera

CareDx will not be prejudiced if its motion is denied because (1) it had an opportunity to explore its novel interpretation of the claims before and during trial, (2) Dr. Quackenbush's post-trial testimony does not support CareDx's theory, and (3) Dr. Quackenbush's post-trial testimony is cumulative of his trial testimony. CareDx had ample opportunity to litigate validity, and its failure to probe its newfound "no math" theory with Dr. Quackenbush at trial does not warrant

---

[6] *See Praxair Distribution, Inc. v. Mallinckrodt Hospital Products IP Ltd.,* 890 F.3d 1024, 1033 (Fed. Cir. 2018) ("Applying precedent to this case, we agree with Praxair that the Board properly addressed the printed matter doctrine during claim construction."); *C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1377, n.1 (Fed. Cir. 2020) ("[T]he questions of whether certain claim elements are directed to printed matter and whether such printed matter is functionally related to other claim elements may properly be resolved during claim construction.").

reopening the record. CareDx has no credible argument that Dr. Quackenbush's post-trial testimony somehow alerted CareDx to this argument since, as discussed at length above, there is no daylight between Dr. Quackenbush's trial and post-trial testimony, and CareDx has had the entire case to develop its contentions.

Because CareDx is attempting to read limitations out of the claim (*i.e.*, the use of any math), the claim would need to be construed, requiring briefing from the parties and a Markman hearing. CareDx is in essence trying to invalidate the '544 Patent by using a different, novel, and broader interpretation that has no legal or factual support, either at trial or in this post-trial phase.

Reopening the record would in fact only reward CareDx's belated self-contradiction. Notably, CareDx relied on the antithesis of the position it now takes to avoid ongoing liability, and ████████████████████████ ██████ to design around infringement. Natera, after all post-trial discovery was completed, understood CareDx's RFS-AlloSure not to infringe under the correct interpretation of the claims (*i.e.* as requiring computation) and withdrew its infringement claim accordingly.

While CareDx suffers no prejudice in not reopening the Section 101 briefing, Natera would suffer prejudice if the record is reopened. At a minimum, reopening the case would punish Natera for withdrawing its claim of infringement for the RFS-AlloSure. Natera made this decision after discovery revealed that Natera's ongoing

infringement case was not to be pursued. In essence, CareDx would get an opportunity to broaden the claims to try and invalidate them without risking the possibility that it also infringes that broadened claim (which it certainly would). As CareDx now (mis)interprets it, RFS-AlloSure would certainly infringe the '544 Patent but for the fact that Natera has chosen not to pursue an ongoing infringement case.

Reopening the record in service of a post-trial sea change in contentions would be extraordinary, improper, and prejudicial. That said, if the Court grants CareDx's motion to reopen the record, it should likewise reopen the record for infringement of RFS-AlloSure, and order a briefing schedule on that issue.[7] CareDx's about-face would clearly amount to good cause to amend the schedule for determining infringement by RFS-AlloSure.

**D.    Reopening The Record Would Be Burdensome And Waste The Court's Time**

CareDx's request to reopen the record is extraordinary. Reopening the case would require additional work for Dr. Quackenbush, Natera, and the Court, including claim construction and possibly a new jury trial.

---

[7] Contrary to CareDx's contentions (at 18), there is no "undue prejudice" caused by Natera's pursuit of post-trial discovery into whether RFS-AlloSure infringes the '544 Patent. After fact and expert discovery, Natera opted not to pursue ongoing infringement. CareDx freely agreed to engage in post-trial litigation, and Natera dropped its claims at the end of discovery. D.I. 430.

That CareDx's "no mathematical computation" interpretation of the patent flies in the face of its own proffered evidence, the intrinsic record, and the plain language of the claims has been discussed at length in Sections III.A-C. But reopening the record to entertain this new theory could also require a new jury trial, which CareDx needed to request months ago (*see* D.I. 479). CareDx argues (at 19-20) that because the jury acted in an advisory capacity regarding CareDx's Section 101 defense, no new trial will be required. This argument is incorrect for reasons described in Natera's opposition to CareDx's Section 101 briefing. *See* D.I. 509, Section III.A. But even if the jury's verdict were "advisory," the jury relied on argument presented to it at trial regarding Section 101 and found accordingly. *Id.*, Section III.B.

CareDx's reliance on *In re Chemed Corp., S'holder Derivative Litig.*, No. 13-1854-LPS-CJB, 2017 WL 1712530, at *5-10 (D. Del. Apr. 25, 2017), *report and recommendation adopted*, No. 13-1854-LPS-CJB, D.I. 79 is inapposite. In *Chemed*, the court found that supplementation of the record with evidence regarding ownership of certain stock "could hardly be more probative," was necessary to decide plaintiff's motion, and "would not require the re-opening of a jury trial." *Id.* at 7-8. Here, as described above, the purported evidence is not probative or necessary to decide the Section 101 issue, and could require a new jury.

## IV.   CONCLUSION

For the foregoing reasons, Natera respectfully requests that the Court deny CareDx's motion to reopen the record.  However, if the Court does grant it, Natera requests it also grant Natera leave to reopen the record on its ongoing infringement case in light of CareDx's proposed new theories and evidence.

<br>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*

OF COUNSEL:

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA  94065
(650) 801-5000

Andrew M. Holmes
Jeff Nardinelli
Jocelyn Ma
Andrew E. Naravage
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600

Sandra L. Haberny, Ph.D.
Sarah M. Cork, Ph.D.
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
dfahnestock@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Natera, Inc.*

Bianca Fox
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

Abigail E. Clark
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
2601 South Bayshore Dr, Suite 1550
Miami, FL 33133
(305) 402-4880

October 21, 2024

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that the foregoing document contains 4,983 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font.  The word count includes only the body of the brief.  The word count does not include the cover page, tables of contents and authorities, or the counsel blocks.

*/s/ Derek J. Fahnestock*
_____
Derek J. Fahnestock (#4705)

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 21, 2024, upon the following in the manner indicated:

| | |
|---|---|
| Brian E. Farnan, Esquire<br>Michael J. Farnan, Esquire<br>FARNAN LLP<br>919 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Edward R. Reines, Esquire<br>Derek C. Walter, Esquire<br>Shawn Chi, Esquire<br>Nate Ngerebara, Esquire<br>August Melcher, Esquire<br>Concord Cheung, Esquire<br>WEIL, GOTSHAL & MANGES LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Randi W. Singer, Esquire<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| W. Sutton Ansley, Esquire<br>WEIL, GOTSHAL & MANGES LLP<br>2001 M Street NW, Suite 600<br>Washington, DC 20036<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |

/s/ *Derek J. Fahnestock*

_____
Derek J. Fahnestock (#4705)