## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NATERA, INC.,

               Plaintiff,

        v.

CAREDX, INC.,

               Defendant.

Civil Action No. 20-38-CFC-CJB
(CONSOLIDATED)

---

Jack B. Blumenfeld, Derek J. Fahnestock, and Anthony D. Raucci, MORRIS, NICHOLS, ARSHT, & TUNNELL LLP, Wilmington, Delaware; Kevin P.B. Johnson, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Redwood Shores, California; Sandra L. Haberny, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; Andrew M. Holmes and Jeff Nardinelli, QUINN EMANUEL URQUHART & SULLIVAN, LLP, San Francisco, California; Bianca Fox, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York

      *Counsel for Plaintiff*

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Edward R. Reines, Derek C. Walter, Nate Ngerebara, August Melcher, Concord Cheung, and Shawn Chi, WEIL, GOTSHAL & MANGES LLP, Redwood Shores, California; W. Sutton Ansley, WEIL, GOTSHAL & MANGES LLP, Washington, D.C.

      *Counsel for Defendant*

## MEMORANDUM OPINION

February 24, 2025
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

I held a five-day jury trial in this patent infringement case brought by

Plaintiff Natera, Inc. against Defendant CareDx, Inc. Natera asserted at trial

claims of two patents: U.S. Patent No. 11,111,544 (the #544 patent) and U.S.

Patent No. 10,655,180 (the #180 patent). In the first phase of trial, the jury found

that two CareDx cell-free DNA (cfDNA) blood tests used to determine whether an

organ transplant is being rejected—AlloSure and AlloSeq—infringed the asserted

claims of the #544 patent but did not infringe the asserted claims of the #180

patent. D.I. 460 at 1–2. The jury also found that none of the asserted claims were

invalid for obviousness or lack of adequate written description. D.I. 460 at 4–5.

And finally, for each asserted claim, the jury found that none of the limitations of

that claim both individually and in combination with each other were well-

understood, routine, or conventional as of the priority date of the asserted claim.

D.I. 460 at 6–11. In the second phase of trial, the jury awarded Natera a damages

award of approximately $96 million, consisting of $83.7 million in lost profits for

infringing sales of AlloSure, $12.5 million in reasonable royalties for sales of

AlloSure, and $92,350 in reasonable royalties for infringing sales of AlloSeq. *See*

D.I. 461 at 1–3.

Pending before me is CareDx, Inc.'s "Motion for Judgment as a Matter of Law Under [Federal Rule of Civil Procedure] 50 or, in the Alternative, New Trial Under [Federal Rule of Civil Procedure] 59." D.I. 485. CareDx seeks by its motion a judgment of invalidity of the asserted claims of the #544 and #180 patents for lack of adequate written description and a judgment of ineligibility of the #180 patent claims under 35 U.S.C. § 101. D.I. 486 at 2–19. CareDx also asks that I hold as a matter of law that foreign damages were improper in this case and that the jury's lost profits award was unsupported and excessive. D.I. 486 at 19–21. In the alternative, CareDx asks for a new trial or remittitur of damages. D.I. 486 at 21–22.

## I.    THE ASSERTED PATENT CLAIMS

### A.    The #544 Patent

In Natera's words, "[t]he claims of the [#]544 [p]atent" are:

> directed to preparing preparations of amplified DNA derived from a biological sample and measuring DNA in a biological sample using synthetic pieces of DNA, including amplification products, which are produced using synthetic tools such as primers, to provide a novel and innovative solution to problems peculiar to the particular problem of amplifying and measuring small amounts of DNA from one individual or organism in a biological sample of another individual or organism.

D.I. 120 ¶ 28. Natera asserted three claims of the #544 patent at trial: claims 21, 26, and 27.

2

Claim 21 claims:

> A method for preparing a preparation of amplified DNA
> derived from a biological sample of a second individual
> useful for determining genetic data for DNA from a first
> individual in the biological sample, the method
> comprising:
>
>> extracting cell-free DNA from the biological
>> sample;
>>
>> preparing a preparation of amplified DNA by
>> amplifying a plurality of target loci on the cell-free
>> DNA extracted from the biological sample to
>> generate amplified DNA;
>>
>> analyzing the preparation of amplified DNA by
>> sequencing the amplified DNA using sequencing-
>> by-synthesis to obtain genetic data of the plurality
>> of target loci, and determining the most likely
>> genetic data for DNA from the first individual
>> based on allele frequencies in the genetic data at
>> the plurality of target loci.

#544 patent at claim 21.

Claims 26 and 27 depend from claim 21. Claim 26 claims "[t]he method of claim 21, wherein the amplifying comprises targeted PCR and universal PCR." #544 patent at claim 26. Claim 27 claims "[t]he method of claim 21, wherein the sequencing-by-synthesis comprises clonal amplification of the amplified DNA and measurement of sequences of the clonally amplified DNA." #544 patent at claim 27.

**B.    The #180 Patent**

According to Natera, the claims of the #180 patent are:

> directed to measuring DNA in a sample using synthetic pieces of DNA, including amplification products, which are produced using synthetic tools such as primers, to provide a novel and innovative solution to problems peculiar to the particular problem of amplifying and measuring small amounts of DNA from one individual or organism in a biological sample of another individual or organism.

D.I. 119 ¶ 26. Natera asserted two claims of the #180 patent at trial: claims 14 and

15.

Claim 14 claims:

> A method for measuring an amount of DNA in a biological sample, the method comprising:

> > (a) performing a targeted PCR amplification for more than 100 SNP loci on one or more chromosomes expected to be disomic in a single reaction mixture using more than 100 PCR primer pairs, wherein the reaction mixture comprises cell-free DNA extracted from a biological sample of a subject comprising DNA of mixed origin, wherein the DNA of mixed origin comprises DNA from the subject and DNA from a genetically distinct individual, wherein neither the subject nor the genetically distinct individual is a fetus, wherein the DNA of mixed origin comprises DNA from a transplant, and wherein the amplified SNP loci comprise SNP loci on at least chromosome 1, 2, or 3;

4

(b) measuring a quantity of each allele at a plurality of amplified SNP loci that comprise an allele present in the genetically distinct individual but not the subject, wherein the quantity of each allele at a plurality of amplified SNP loci are measured by high-throughput sequencing;

(c) measuring an amount of the DNA from the genetically distinct individual in the biological sample using the quantity of each allele at the SNP loci and an expected quantity of each allele at the SNP loci for different DNA fractions,

wherein the method is performed without prior knowledge of genotypes of the genetically distinct individual.

#180 patent at claim 14.

Claim 15 claims:

[t]he method of claim 14, further comprising determining a bias of the PCR amplification, and using the bias to statistically correct the determined quantity of each allele at the plurality of SNP loci on the one or more chromosomes expected to be disomic before the quantity of each allele is used to determine the amount of the DNA from the genetically distinct individual.

#180 patent at claim 15.

## II.    LEGAL STANDARDS

CareDx brought the pending motion pursuant to Rule 50(b).  Under that rule, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ.

P. 50(b).  A motion filed under Rule 50(b) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

## III.    ANALYSIS

### A.    Judgment of Invalidity of the Asserted Claims as a Matter of Law

CareDx argues that the jury's verdict cannot stand and that CareDx is entitled to judgment of invalidity of the asserted claims of both patents as a matter of law for lack of adequate written description because the asserted patents' specifications (1) do not disclose the inventions in the asserted claims as an integrated whole as opposed to a collection of claim limitations and (2) do not disclose key individual claim elements of the asserted claims.  D.I. 486 at 2–16.  CareDx also argues that the #180 patent is invalid as a matter of law because it claims unpatentable subject matter.  D.I. 486 at 16–19.

As discussed below, I agree with CareDx that it is entitled to judgment of invalidity of the asserted claims as a matter of law for lack of adequate written description.  Having made that determination, I need not and do not address CareDx's arguments regarding the patentability of the #180 patent's subject matter. *See Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1306 (Fed. Cir. 2005)

("Because we uphold the judgment as to invalidity on [anticipation and enablement] grounds, it is not necessary for us to reach the issues of obviousness and indefiniteness.").

### 1.    The Legal Requirements of a Patent's Written Description

Section 112(a) of the Patent Act requires that the specification of a patent "contain a written description of the invention." 35 U.S.C. § 112(a).  To satisfy this requirement, a patent's written description must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).  In other words, the patent's specification must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Id.* (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)).

"This inquiry . . . is a question of fact." *Id.*  And "determining whether a patent complies with the written description requirement will necessarily vary depending on the context." *Id.*  The description can be made using "words, structures, figures, diagrams, formulas, etc." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).  And the patentee can also "rely on information that is 'well-known in the art' to satisfy written description." *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (citation omitted).

7

But to meet § 112(a)'s requirements, the specification must "describ[e] the

*invention*, with all its claimed limitations, not that which makes [the invention]

obvious." *Lockwood*, 107 F.3d at 1572 (emphasis in the original). Federal Circuit

case law makes clear that "[a] description which renders obvious the invention . . .

is not sufficient" to satisfy § 112(a). *Id.* Thus, "[w]hile the written description

requirement does not require that the specification recite the claimed invention in

any particular way, pointing to an 'amalgam of disclosures' from which an artisan

could have created the claimed invention does not satisfy this requirement."

*Flash-Control, LLC v. Intel Corp.*, 2021 WL 2944592, at *3 (Fed. Cir. July 14,

2021) (quoting *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d

1336, 1349 (Fed. Cir. 2013)). "Instead, the specification must present each claim

as an 'integrated whole.'" *Id.* (quoting *Novozymes*, 723 F.3d at 1349). "A patent

owner cannot show written description support by picking and choosing claim

elements from different embodiments that are never linked together in the

specification." *Flash-Control*, 2021 WL 2944592, at *4.

### 2.     The #544 Patent

Claim 21, from which claims 26 and 27 depend, claims a method by which

(1) cell-free DNA is extracted from a biological sample of one individual (i.e., the

"second individual"); (2) target loci on the extracted cell-free DNA is "amplified"

and "sequenc[ed by] synthesis to obtain genetic data"; and (3) "the most likely

8

genetic data" for DNA from another individual (i.e., the "first individual") in the obtained genetic data is "determin[ed]" from that data "based on allele frequencies." CareDx argues, and I agree, that no reasonable jury could find, based on the evidence adduced at trial, that the #544 patent's written description sufficiently demonstrates that the inventors possessed the full scope of this claimed method.

As an initial matter, and as CareDx's expert Dr. Brian Van Ness testified at trial, nowhere in the text of the #544 patent is there a description of the combination of claim 21's elements as an integrated whole. 1.24.24 Trial Tr. (docketed as D.I. 468) at 813:17–815:16. Natera does not dispute the absence of an explanation in the patent's written description of the combination of the claimed steps. Indeed, in rebutting CareDx's contention that the patent lacks adequate written description, Natera cites only two portions of the patent's written description: (1) lines 44 and 45 in column 8 for the proposition that "sequencing-by-synthesis *can* 'be used for genotyping and SNP analysis,'" D.I. 510 at 8–9 (emphasis added); and (2) line 36 in column 54 through line 38 in column 65 for the propositions that the written description "discloses analysis via Matched Filtering of mixed samples processed using sequencing-by-synthesis" and "methods that do not require genetic information about a related individual," D.I. 510 at 10.

9

Instead of pointing to specific text in the patent to show that the written description adequately describes the combination of the claimed steps as an integrated whole, Natera relies exclusively on this testimony of its expert Dr. John Quackenbush:

> Q.  And were you here -- did you hear Dr. Van Ness opine yesterday that the [#]544 Patent does not include written description of the [#]544 Patent claims as a whole?
>
> A.  I was here, and I heard him make those arguments. And from the perspective of a person of ordinary skill in the art, if you look at the claims, right, you see how they fit together.  You see worked examples of different pieces.  And if you know enough about the field -- and remember, Dr. Van Ness set a high very bar for a person of ordinary skill in the art; lots of experience, lots of computational and genetics experience, you should be able to put these things together.
>
> If you do word searches, you may find it.  But if you actually read it and understand what it's telling you, right, like mixed samples being mixed samples, then you understand that this entire whole of Claim 21 is disclosed.

1.25.24 Trial Tr. (docketed as D.I. 469) at 1095:5–21.  This conclusory testimony, however, is "far too general" to support the jury's finding of adequate written description for claim 21 (as well as for claims 26 and 27, since they both depend from claim 21).  *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1336–37 (Fed. Cir. 2021) (rejecting district court's reliance on expert testimony

10

that was "far too general" and holding that district court erred in not granting judgment of inadequate written description as a matter of law because "substantial evidence d[id] not support the jury's finding of adequate written description"). Even if Dr. Quackenbush had identified "worked examples of different pieces" in the patent's specification, he never pointed to any text in the patent's written description that would lead an artisan of ordinary skill to know that the inventor had invented a combination of those different pieces. 1.25 Tr. at 1095:11–12. At most, Dr. Quackenbush identified textual support for certain elements of claim 21 and asked the jury to take it on his word that an artisan of ordinary skill "should be able to put these things together." 1.25 Tr. at 1095:15–16. That strategy fails as a matter of law. "[P]ointing to an 'amalgam of disclosures' from which an artisan could have created the claimed invention does not satisfy th[e] [written description] requirement." *Flash-Control*, 2021 WL 2944592, at *3 (quoting *Novozymes*, 723 F.3d at 1349).

A rational juror could not have found the #544 patent's written description adequate for the additional reason that no substantial evidence was adduced at trial to show that the inventor possessed a sequencing-by-synthesis technique to measure allele frequencies in cell-free DNA. Natera admits, as it must, that "[t]he [#]544 Patent includes no working examples of experiments that used sequencing-by-synthesis." D.I. 447 ¶ 53. It also admits, as it must, that "[t]he [#]544 Patent

11

includes no working examples of experiments on cell-free DNA." D.I. 447 ¶ 54. The patent's written description refers to sequencing-by-synthesis only once, and it teaches away from it. *See* #544 patent at 8:44–48 (stating that "[p]yrosequencing, or sequencing[-]by[-]synthesis, can also be used for genotyping and SNP analysis" but "is not currently conducive to high-throughput parallel analysis"). And although Dr. Quackenbush testified at trial that mini-sequencing is a form of sequencing-by-synthesis and that the written description "talk[s] about" mini-sequencing, 1.24 Tr. at 986:8–9, he did not identify any text in the patent that would show to an artisan of ordinary skill that mini-sequencing is capable of measuring allele frequencies in cell-free DNA. Moreover, the two brief discussions about mini-sequencing in the written description teach away from the idea that mini-sequencing was a technique contemplated by the inventor for use in practicing the claimed method. Specifically in column 4, the patent identifies mini-sequencing as one of "a number of advanced technologies that enable the diagnosis of genetic aberrations at one or a few loci at the single cell level" but states in the next two sentences that "[t]he reliability of the data generated by all of these techniques relies on the quality of the DNA preparation" and that "[b]etter methods for the preparation of single-cell DNA for amplification and PGD are therefore needed." #544 patent at 4:3–11. And in column 7, the patent states that "mini-sequencing permits analysis of very small DNA fragments with low ADO

12

rate," but states in the next sentence that "[b]etter methods for the preparation of single-cell DNA for amplification and PGD are therefore needed." #544 patent at 7:29–32.

There being no substantial evidence to support the jury's finding of adequate written description in the #544 patent, judgment of invalidity of the asserted claims of the #544 patent as a matter of law is warranted. Natera argues that "[t]he jury could have reasonably concluded that CareDx failed to meet its burden even if Natera had not presented *any* evidence on written description." D.I. 556 at 5 (emphasis in the original). In support of this assertion, it relies on a statement in *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986) that "[a] patent being presumed valid at birth, a patentee need submit *no* evidence in support of a conclusion of validity by a court or a jury." *Id.* at 1570 (emphasis in the original) (citation omitted). But as the two sentences that immediately follow that statement in *Orthokinetics* make clear, to defeat a defendant's motion for judgment of invalidity as a matter of law, the patentee need not submit evidence *only* if the evidence of invalidity adduced by the defendant was "totally inadequate" to support an invalidity finding:

> If the patent challenger introduces evidence that might lead to a conclusion of invalidity, a patentee would be well advised to introduce evidence sufficient to rebut that of the challenger. *If the challenger's evidence be totally inadequate*, a patentee's motion for judgment or directed

13

> verdict that the challenger's § 282 burden had not been
> carried would be appropriately granted before the patentee
> introduces any rebuttal evidence.

*Id.* (emphasis added).  If, however, the challenger introduces evidence that would

justify a conclusion of invalidity, the patentee has "the burden of going forward

with evidence" to rebut that conclusion.  *Tech. Licensing Corp. v. Videotek, Inc.*,

545 F.3d 1316, 1327 (Fed. Cir. 2008).

In this case, given Dr. Van Ness's testimony and the absence of supporting

text in the #544 patent's written description, that burden of production required

Natera to "produc[e] additional evidence and present[] persuasive argument based

on new evidence or evidence already of record."  *Id.*  Natera, however, failed to

identify existing evidence or adduce new evidence of disclosures in the #544

patent that describe either claim 21's limitations as an integrated whole or a

sequencing-by-synthesis technique to measure allele frequencies in cell-free DNA.

Accordingly, I will grant CareDx's motion for judgment of invalidity of the

asserted claims of the #544 patent as a matter of law for lack of adequate written

description.

### 3.    The #180 Patent

The #180 patent's written description for asserted claims 14 and 15 is

inadequate as a matter of law for the same reason the #544 patent's written

description is inadequate—i.e., Natera did not adduce at trial substantial evidence

14

that the patent's text shows that the inventor possessed the combination of the elements of the claimed methods.

Natera argues that "Dr. Quackenbush explained [at trial] how the claims are integrated as a whole because the written description, when read in its entirety, sets forth the basis for a[n] [artisan of ordinary skill] to understand what the claimed invention is." D.I. 510 at 16 (citing 1.25 Tr. (docketed as D.I. 469) at 1163:5–1164:5). It cites the following testimony—and *only* the following testimony—in support of this assertion:

> Q. So tying this together, do you have any opinions on whether Dr. Van Ness'[s] position that the Natera patents do not describe the claimed methods in enough detail to show the inventors possessed them is consistent with his opinion that they were so routine and conventional they would have been obvious?
>
> A. So this is something I found really confusing about Dr. Van Ness'[s] presentation, right? He said, oh, if I look at other things, it's obvious this is true. Right? So it's pulling puzzle pieces from different boxes and trying to fit them in.
>
> *But if I look at the patent, I can't* [sic] *figure out how to put those pieces together, right?* If it was really routine and conventional, then somebody can look at the patent and fill in the gaps. Right? You don't have to read everything in the patent. It doesn't all have to be there. You apply your experience as someone skilled in the art.
>
> *The fact that he didn't find written description means he couldn't fill those things in, but that's*

15

> inconsistent with the fact that you reach out and grab a bunch of other things and plug them in.  Right?
>
> **_So, you know, my opinion is that it's there.  If I look from the perspective of a person of ordinary skill in the art, I see it's there_**, and I see deficiencies with these other external references.

1.25 Tr. at 1163:5–1164:5 (emphasis added).

As an initial matter, it's not clear to me that Dr. Quackenbush intended to say, "But if I look at the patent, I can't figure out how to put those pieces together."  I think there's some chance Dr. Quackenbush meant to say, "I *can* figure out how to put those pieces together."  On the other hand, it may be that Dr. Quackenbush very much intended to use the words attributed to him in the transcript, that he was paraphrasing Dr. Van Ness's written description opinions, and that he was pretending to speak as if he were Dr. Van Ness and therefore using the first-person "I."  But putting that ambiguity aside and reading Dr. Quackenbush's testimony in the light most favorable to Natera, *the entirety* of the justification Dr. Quackenbush offered at trial for his opinion that the #180 patent's written description adequately described the combination of the asserted claims' elements was "it's there" and "I see it's there."  That opinion is the epitome of conclusory.  And, as a matter of law, it does not constitute substantial evidence that would justify a jury's finding of adequate written description for the asserted claims integrated as wholes. *See Juno*, 10 F.4th at 1337.  Accordingly, as Natera

16

does not cite any other evidence to counter CareDx's argument that the #180 patent's written description does not adequately describe the combination of the elements of the claimed methods, I will grant CareDx's motion for judgment of invalidity of the asserted claims of the #180 patent as a matter of law.

### B.    New Trial

Rule 50(c)(1) provides that "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). The law of the district court's circuit governs the standard for ordering a new trial in a patent case. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013). Under Third Circuit law, "[a] new trial may be granted when the verdict is contrary to the great weight of the evidence; that is, 'where a miscarriage of justice would result if the verdict were to stand.'" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) (quoting *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3d Cir. 1993)).

CareDx argues that a new trial is warranted because "the jury verdict is contrary to the great weight of the evidence and the damages award is excessive." D.I. 486 at 22. For the reasons stated above, I agree that the jury's determination that the written descriptions of the asserted patents are adequate is contrary to the evidence. But, assuming for the purposes of Rule 50(c)(1) that the Federal Circuit

17

disagrees with that conclusion, I do not agree that the jury's damages award would require a new trial.

First, the jury's damages award for infringing sales of AlloSure—i.e., all but $92,350 of the total damages award of $96 million—was not contrary to the great weight of the evidence. Natera adduced substantial record evidence to support the jury's lost profits award, as that evidence provided a basis for a rational juror to conclude that there was a "reasonable probability" that but-for CareDx's infringement, Natera would have made a portion of CareDx's infringing sales. The evidence, including admissions by CareDx, showed the advantages of cfDNA testing over non-cfDNA testing and provided a basis to use the market for cfDNA testing as the relevant market for a lost profits assessment. *See, e.g.*, 1.26.24 Trial Tr. (docketed as D.I. 470) at 1495:11–1496:10 (PTX-279, detailing advantages of cfDNA testing over "less accurate" DSA and "invasive" biopsy); 1496:15–1497:6 (PTX-456, CareDx brochure describing drawbacks of biopsy); 1497:8–1498:4 (CareDx describing advantages of cfDNA tests over biopsy and creatinine); 1576:2–1577:20 (admissions from CareDx expert). The evidence further showed that CareDx made $350 million in infringing sales in the cfDNA testing market during the damages period, 1.26 Tr. at 1572:22–1573:6, and that CareDx competed directly with Natera and Eurofins in that market, 1.26 Tr. at 1489:19–1491:21. It also provided a basis for the jury to conclude that Natera and Eurofins would

18

capture CareDx's market share in a but-for world in which CareDx did not
compete. 1.26 Tr. at 1489:19–1491:25, 1500:17–1501:11.

Second, although I agree with CareDx that the jury erred in awarding
compensatory damages for foreign sales of AlloSeq and that the $92,350 award of
reasonable royalties for sales of AlloSeq "ignores the final jury instructions,"
D.I. 486 at 19 (quoting D.I. 458 at 4), that error by the jury can be remedied
without a new trial. CareDx is correct that Natera adduced no evidence at trial that
any sale of AlloSeq was made in the United States; nor did Natera adduce any trial
evidence to show that any domestic infringement caused foreign sales of AlloSeq.
Natera does not dispute in its briefing that it adduced no record evidence of sales of
AlloSeq in the United States. *See* D.I. 510 at 20. Natera argues instead that record
evidence showed that CareDx used AlloSeq in its research laboratory to perform
the asserted claims in the United States and that "evidence connect[ed] AlloSeq
foreign sales to CareDx's domestic infringement." D.I. 510 at 20 (citing 1.23.24
Trial Tr. (docketed as D.I. 467) at 383:22–384:11). The testimony Natera cites in
support of this connection, however, does not make a connection between
CareDx's domestic infringement and foreign sales of AlloSeq. *See* 1.23 Tr. at
383:22–384:2.

Because there was no evidence from which a rational juror could have
concluded that foreign sales of AlloSeq practiced the asserted claims in the United

19

States, had I denied CareDx's motion for judgment of invalidity as a matter of law,

I would have set aside the jury's $92,350 damages award for AlloSeq sales. *See*

*Tucker v. Spalding*, 80 U.S. 453, 455 (1871) ("[I]t . . . remains the essential nature

of the jury trial that while the court may on [a] mixed question of law and fact, lay

down to the jury the law which should govern them, so as to guide them to truth,

and guard them against error, and may, if they disregard instructions, set aside their

verdict[.]").  CareDx does not argue, however, and there is no basis to conclude,

that the jury's damages award for AlloSeq sales had any bearing on its award for

infringing AlloSure sales.  Accordingly, I will conditionally deny CareDx's motion

for a new trial.

## IV.  CONCLUSION

For the reasons stated above, I will grant CareDx's motion for judgment of

invalidity of the asserted claims of the #544 and #180 patents as a matter of law for

inadequate written description, and I will conditionally deny CareDx's motion for

a new trial.

The Court will issue an Order consistent with this Memorandum Opinion.